Opinion delivered June 27, 1888.

---

No. 6001.

T. P. VARNELL *v.* THE STATE.

1. MURDER—CHARGE OF THE COURT.—Two rules may be evolved from the statutes bearing upon the culpability of an accused who, having produced the occasion, slays his antagonist in the combat: 1. If he provoked the difficulty or produced the occasion, in order to obtain a pretext to kill the deceased or do him some serious bodily harm, the killing will be murder, no matter to what extremity the slayer may have been reduced in the combat. 2. But if he provoked the difficulty

or produced the occasion without any felonious intent—intending, for instance, an ordinary battery—the final killing in self defense will be manslaughter only. See the opinion for a charge of the trial court *held* erroneous because there was no evidence adduced upon the trial tending to show that the accused provoked the combat for the purpose of killing or in any manner injuring the deceased.

2. SAME.—It was proved, in substance, that the defendant and a daughter of the deceased withdrew together, about eleven o'clock at night, from · the house of the deceased, at which there was a social gathering and that a short time later they were discovered by another daughter of the deceased, on the ground, a short distance from the house, copulating, with the consent of the girl, who, when discovered by her sister, fled to the house; and that a short time later the deceased came upon the scene of the recent copulation, and the shooting occurred. Under this proof the trial court charged, in effect, that every man has the right to interfere to prevent the debauchery of his minor daughter, and if the defendant, at the house of the deceased, sought to have carnal intercourse with the minor daughter of deceased, and deceased interfered to prevent such carnal intercourse, and that for such interference the defendant shot and killed him with express malice, he was guilty of murder in the first degree, and if not with express malice, he was guilty of murder in the second degree. *Held*, that the charge was erroneous and inapplicable to the proof.

3. SAME.—Defendant requested an instruction to the effect that "even if defendant had intercourse with Ella Land, and Ella had separated from him and left the place, and then deceased, with an axe, made such an assault upon defendant as caused him reasonably to apprehend death or serious bodily injury, he would have been justifiable in killing deceased," which was refused. *Held*, in view of the evidence adduced upon the trial, the refusal to give the instruction was error.

APPEAL from the District Court of Hill. Tried below before the Hon. J. M. Hall.

The conviction in this case was in the second degree for the murder of Jonas H. Land, in Hill county, Texas, on the fifth day of March, 1883. The penalty assessed by the jury was a term of nine years in the penitentiary.

Mrs. Emma Beasley was the first witness for the State. She testified that she was the daughter of Jonas H. Land, deceased, and that she had married since his death. She knew the defendant, whom she pointed out in court. Defendant shot and killed the deceased at the house, or on the premises, of the latter, on the night of March 5, 1883. There was a social gathering at the deceased's house on that night. Defendant and one George Walker came to the entertainment together.

The dancing was done in a vacant house on the premises a short distance from the house. While witness, her sister Ella and others were partaking of refreshments, the defendant and Walker came and announced that a set for dancing was forming. Soon after this the witness missed her sister Ella from the house, and went at once in quest of her. After searching for some time she found Mr. Philpott lying on the ground at a point twenty or thirty steps west from the house. She placed her hand on Philpott and aroused him. and about that time discovered her sister Ella and the defendant lying together on the ground, at a point not far distant, and asked: "What are you doing here?" Ella replied: "Make him quit, for I can't." Witness thereupon pulled the defendant up, and Ella got up and fled to the house. The defendant seized witness's sleeve and told her to help him hunt for his pistol. Witness replied: "Have you any respect for me? Let me go; if father sees me out here he will kill me." The latter part of this remark was made by witness to get away from defendant. Defendant replied: "If he does (kill witness), I will kill him!" Soon afterwards the deceased came up with nothing but a lantern in his hand, and asked: "What does all this mean?" Defendant replied: "Stand back! I am a desparate man!" The defendant instantly fired two shots, and deceased threw up his hands, exclaiming: "O my God! I am shot!" Deceased made no effort nor demonstration to attack or hurt the defendant. The shooting occurred at a point twenty or thirty steps west from the vacant house. The witness was unable to say what the defendant and her sister Ella were doing while on the ground, more than that Ella was struggling to release herself. Ella at that time was in the midst of her menstrual period—a fact which the witness first learned on that night. The witness had previously known defendant, but if her sister Ella had ever met him before that night, witness was not aware of it. Soon after the shooting the witness discovered Ella in a fainting condition, and sent Tom Barrett for Doctor Waller. The pistol with which the defendant shot the deceased was handed to him by George Walker. Witness's sister Ella had become deaf since the tragedy, and had been for some time, at the date of this trial, an inmate of the Deaf and Dumb Asylum at Austin. All of this occurred in Hill county. Texas.

On her cross examination, the witness said that she was the oldest of her father's five children, and her sister Ella was the

second in age.  Witness was past eighteen years of age at the
time of the tragedy, and Ella past sixteen.  Witness did not
know how long Ella had been menstruating, but discovered
it for the first time on that night.  Twelve or fourteen—perhaps
more—persons were in attendance upon the party on the night
of the killing.  A young man, now in Missouri, but at that
time staying at the house of Mr. Beasley, the witness's brother-
in-law, got up the party, with the consent of the deceased, and
invited the guests.  Miss Tidwell was the only lady besides
witness and her sister who participated in the entertainment.
Witness visited Hubbard City on the day of the party, but got
no whisky nor other articles for the entertainment.  Whisky
was drunk at the party—a fact which witness learned but did
not see.  The night was a cloudy one.  Witness missed her
sister and began a search for her between eleven and twelve
o'clock.  She searched first through the house in which the
dancing was done, and then went outside to search.  That
house consisted of a large and a small room, with an attic or
half story above.  Deceased was in that house when witness
began her search.  Deceased then went from that house to the
residence house.  Beasley, witness's present husband, started
with the witness on her search, but left her at the corner of the
house and was not with her when she found defendant and her
sister.

Witness was sworn and testified at the coroner's inquest.  She
also had a talk with Mr. Golledge at the Mills House, in Hills-
boro, in which she told Golledge that Walker handed defendant
the pistol; that Walker held it out and Varnell snatched it;
which was a fact.  Witness could not now remember that Jeff
Hale was or was not with witness's party on the return from
the habeas corpus trial of Walker at Hillsboro, but she knew
that she did not, on that or any other occasion, tell Hale that
her testimony was different on the different trials.  Golledge
wrote down the witness's statements to him, and witness told
him, after reading it over, that the statement as written was
substantially correct.  She did not say that it was correct word
for word.  Defendant told Walker to give him the pistol.  Wit-
ness had never said that Walker refused to give the pistol to
the defendant.  The small room next to the dancing room had
a light in it part of the time only.  The witness had never said
that she discovered the defendant and Ella by means of whis-
perings between them.  She heard talking in a low tone of

voice, and was led to her discovery by that means. She could not tell whether the low talk proceeded from one or more voices. Defendant was on one knee when witness reached the scene, and Ella was struggling to get up. The witness seized defendant by the hair when she pulled him up. One of the doors of the house opened towards the point at which defendant and Ella were lying, but witness did not know whether it was open or closed at that time. Deceased had nothing but the lantern in his hand when he came to Varnell and the witness. Witness did not know where deceased searched before he found Varnell.

A. C. Beasley testified, for the State, that he was at the house of the deceased, attending a dance, on the night of the tragedy. He had subsequently married Emma, the eldest daughter of the deceased. Witness was in the house when the fatal shots were fired. He heard but did not see them fired. The killing occurred about eleven o'clock. Some time before—witness could not say how long—he saw the defendant dancing. Emma soon came to witness and told him that Ella was out of the house, and asked witness to go with her in search of her. Witness went with Emma—she being three or four feet in advance—to a point about fifteen feet from the house, when Varnell called to Emma: "What d—d son of a bitch is that with you?" Witness, being unarmed, turned and went to the house, and about three or four minutes later heard the shots fired. A short time afterwards, witness went outside and saw deceased lying on the ground, face down and dead. An unlighted lantern was lying by him. No weapon of any kind was found near him or on his body. Deceased was about fifty years old. Witness did not know whether the deceased was right or left handed.

Robert Priddy was the next witness for the State. He testified that, at the time of the killing, he was standing on the porch of deceased's dwelling house, thirty or forty steps distant from the point of killing, and saw the flashes and heard the reports of the pistol. A few minutes before that the deceased passed the witness going from the dwelling to the dance house, having nothing in his hands but a lantern. Witness watched him for thirty or forty steps, but did not see him stoop nor pick anything up from the ground. When the pistol shots were fired, deceased whirled around with the exclamation: "Oh, Lord! I am shot!" The lantern was extinguished or went out during the shooting. Witness heard no words spoken at the

time of the shooting. Witness could see deceased at the time of the shooting, but could not say that he could have seen any motions if made by him. At all events, he saw none.

Robert Jones testified, for the State, that just before the fatal shots were fired, he met the deceased between the dwelling and the dance house, going towards the latter. He had a lantern in his hand and nothing else. Witness had a few words with defendant, about a place on the floor, a short while before the shooting. He did not know whether or not the defendant was then armed.

Cross examined, the witness said that there was some drinking at the party, but he, witness, was not under the influence of liquor. Witness was in the small room next to the dancing room for a short while during the night. This was not very long before the shooting. Varnell and Ella Land came to the door of that room while witness was in there, and witness last saw them on that night when they left that door. He was across the room and heard no conversation between them.

S. C. Barber testified, for the State, that he and his wife reached Land's house about midnight, a short time after the tragedy. On or near the place where Land was said to have fallen, the witness found a pad of cloth, such as, according to his wife, is worn by women during the process of menstruation. This pad was found next morning after the killing. On his cross examination, the witness said that on the next morning after the killing—some time between daylight and sun rise, or possibly a little after sun rise—he found an ax on the ground at the place where the killing occurred. The blade was sticking in the ground. He also saw a large number of bottles and flasks about the dance house. Ella Land was a full grown woman in appearance, heavier, but not so tall, as the defendant.

Mrs. Emma Beasley, recalled, testified, for the State, that the ax referred to by the previous witness on his cross examination was stuck in the ground, at the point where the preceding witness saw it, by Babe Curry to mark the spot, pending investigation, where the deceased stood when shot. It had been used to break up an old cultivator on the day before. Deceased was right handed. On her cross examination, the witness said that she testified on the examining trial of Walker that the ax was placed where Barber saw it by Babe Curry. Curry found it near the old cultivator, six or eight feet distant,

and sank the blade in the ground where Barber saw it, in reply to Doctor Walker's request to have the spot marked where deceased stood when shot. The witness did not drink any whisky on the night of the killing.

Robert Jones, recalled by the State, testified that early on the morning after the killing the spot where Land fell was pointed out to him. At that time he saw an ax lying on the ground, fifteen or twenty feet distant from the place of the killing. A six shooter was then lying on the ground fifteen or twenty feet distant from the place of the killing. On his cross examination the witness stated that he had testified about this ax matter before. He had never stated that he saw the ax sticking in the ground. It was early in the morning when he saw the ax and pistol, but he could not now say whether it was before or after Mr. Barber went to the place of the killing. The ax, when witness saw it, was lying near an old cultivator, fifteen or twenty feet distant from the place of shooting, and the pistol was lying on the ground at another point about the same distance from the place of shooting. Zack Taylor was with witness, and either he or the witness took the pistol and gave it to Harrison.

The State closed.

Ed Bryant was the first witness for the defense. He testified that he was at Land's house at the time of the tragedy. Five or ten minutes before the shooting the witness went out of the residence house to the south corner of the portico of the same, and was taking a drink from a bottle when Land passed him, having a lantern in one hand and a short handled ax in the other. As he passed witness Land asked if he, witness, knew where Varnell was, and said that he intended to find and kill him. Witness then walked into the house, and five or ten minutes later he heard the shots, and soon after saw Land's dead body. Witness attended court in connection with this case several times, but never testified previous to this trial. He was brought here by the State, but was not called to testify by it. Witness did not testify on the habeas corpus trial of George Walker. Witness never told anybody what he knew about this case until two or three days before this trial, when he told the attorneys. Witness met and was with Varnell several times before the killing of Land, and had known him personally since that event. He came to witness about two weeks before this trial and asked him what he knew about this case.

Witness did not know Colonel Ivy, and had never stated the facts testified about to Colonel Ivy nor to Mr. Smith, nor to any other attorney prior to to-day.   He did tell them to one attorney some time before this trial, but could not now say who that attorney was.

George Walker was the next witness for the defense.  He testified that he and the defendant went together from Mrs. Varnell's house to Hubbard City on March 4, 1883, and from thence to Waco.   They returned to Hubbard City on the next evening and learned that there was to be a dance at Land's that night.   They were invited by several parties to attend, and did go, together with Zack Taylor and Ed Bryant.   They found twelve or fifteen young men, several from Hubbard City, at the party when they got there.   They danced until about eleven o'clock, everybody, including Emma Land, drinking more or less, when Emma Land came to witness and told him that her sister Ella had left the house, and asked him to help her search for Ella and Tom Varnell.   Witness and Emma left the house, but not together.   Witness met Land, who said he would kill Varnell if he found him with his daughter.   Land went on ahead of witness, and witness followed until he heard Ella Land say: "I'm afraid if father finds this out on me to-morrow he will kill me." About this time witness heard Emma Land say to somebody: "I hear them out there now."   Emma then ran forward, caught Varnell, and said to him:  "What does all this mean, after talking to me as you did to-night?"   She succeeded in pulling Varnell off Ella, when Ella ran off.   Emma then told Varnell that he must go into the house with her.   He replied: "I am not going into the house until I get my pants up."   Emma then had him by the right arm.   Witness, who then saw Land coming, stepped up and said to Varnell and Emma:   "The less said about this the better."   Emma said:  "Yonder comes father. If he finds us here he will kill me."   About this time Land came up, and Varnell told him to stop.   Land, who had a lantern in his right hand, struck at Varnell with some kind of an instrument he had in his left.   Varnell warded off the blow, and Land struck with the same instrument again, and Varnell fired two shots and Land fell.   During all of this time Varnell's pants were down about his knees.   The instrument with which Land struck at Varnell was fifteen inches or two feet long. Witness and Varnell left Land's after the shooting and reached George McNeese's house after daylight.   Defendant went in at

McNeese's, but witness did not. Witness observed on the next day that the skin was knocked off Varnell's face and his chin bruised. He also complained of pain in his arm.

Cross examined, the witness said that he and defendant, while in Waco on March 4, bought a pistol each. They did not purchase the pistols having the Land party in view, but because the witness was then contemplating a trip to Mexico, and defendant a trip out west. They did not hear of the Land party until they got back to Hubbard City on the fifth. Witness admitted that he was drinking when he went to the Land party, and denied that he had ever said that Ned Brown went with his crowd to the party. The witness had never before testified that Emma Land drank, or took a drink of liquor on that night. He never before testified that Land threatened to take the life of the defendant. He only disclosed his knowledge of the facts to Varnell's lawyers a day or two before this trial. He did not disclose these facts to those lawyers when they were defending him, witness, on the same charge. Witness met Land before the shooting as he, witness, left the dance house, Land then going into the house, having nothing in his hands but a lantern. Witness stopped, and Land then went around the house towards the barn. He still had nothing but the lantern in his hands. He was on his way to the dance house when he met witness and told him he would kill Varnell if he found him with one of his daughters. When Land went towards the barn from the dance house, witness followed to a point ten or fifteen steps northwest of the dance house, the barn being twenty-five or thirty steps west of the dance house. When Land came up to defendant and Emma—Ella having fled—he came from the direction of the barn. He then had the lantern in his right hand and some kind of an instrument in his left hand, and it was with that instrument he struck or struck at Varnell before Varnell fired upon him. Varnell shot Land with witness's pistol—having lost his own. Witness did not give or hand his pistol to Varnell; on the contrary, he refused to do so, but Varnell snatched it from witness's waist where he then had it. Witness did not attempt to interfere after Varnell snatched his pistol. Witness stayed in the brush, dodging the officers, for three weeks after the tragedy—he and defendant being together. The first time witness saw defendant after separating from him in the brush was after witness's trial, which was had in December, 1883. That meeting oc-

curred at the house of Mrs. Varnell, defendant's mother, de_
fendant being still on the "scout." Before surrendering, the
witness learned of the testimony of Emma Land before the
inquest to the effect that he, the witness, extended the pistol
to Varnell, and Varnell shot her father with it.

Joe Philpott testified, for the defense, that he was on the
ground near the dance house asleep, just before the fatal shots
were fired. He was aroused by Emma Land, and a few
moments later the killing took place. He did not see the shoot-
ing. Witness was on the ground the next morning, and saw
the pistol that was found. He was an expert in the use of fire
arms, and was confident that that pistol had never been either
loaded or fired. It might have been loaded and the loads with-
drawn, but a load had never been discharged from it. It was
empty when found.

George McNeese testified, for the defense, that the defendant
came to his house about three o'clock on the morning after the
killing of Land. Witness observed a bruise near the defend-
ant's eye, blood on his face, and a bruise on his chin. Witness
lived between five and six miles from Land's house.

S. J. Hale testified, for the defense, that he was at Jonas
Land's house early on the morning after the killing, and helped
dress the body. He found a large opened knife in Land's coat
pocket. Witness served as one of the jury of inquest and heard
all of the testimony developed on that proceeding. Emma
Land testified before that jury that the defendant, just before
he shot Land, asked Walker for the pistol, and that Walker
refused to let him have it, when he snatched it from Walker.
Witness had no conversation with Ella Land about the killing.
Land was a stout, chunky man and would weigh at least one
hundred and seventy-five pounds. Ella Land was a strong,
fleshy woman, but not taller than ordinary women of her age.

The defense closed.

Robert Priddy, recalled by the State, in rebuttal, testified
that he was standing within three or four feet of the dwelling
house when Land passed him. He did not see Ed Bryant at
the time, nor did he hear Land speak to any body from the time
he left the house until he got out of the witness's ear shot.
Witness was not drinking on the night of the tragedy.

It was admitted that the defendant was a fugitive for two
years after the killing, when he was arrested in New Mexico

and brought back and jailed; and that he afterwards escaped, but returned voluntarily and surrendered to the sheriff.

The motion for new trial raised the questions discussed in the opinion.

*Anderson, Flint & Anderson* filed one brief, and *J. M. Anderson, Pearre & Boynton, S. C. Upshaw* and *Thomas Ivy* filed another brief for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

HURT, JUDGE. This conviction was for murder of the second degree, with the penalty fixed at nine years in the penitentiary.

The testimony of Mrs. Beasley, *nee* Land, is in substance as follows: "I am the daughter of Jonas Land, deceased, who was killed at his home in Hill county, Texas, by Tom P. Varnell. On the night of March 5, 1883, there was a gathering at my father's house. Varnell was present. George Walker came with him. There was dancing in a vacant house in the yard. Between eleven and twelve o'clock I missed my sister Ella. Hunting for her on the outside of the house, I found my sister and Varnell lying on the ground. I said: 'What are you doing here?' Ella said: 'Make him quit, for I can't.' I then pulled Varnell up, and my sister Ella ran to the house. Varnell caught me by the sleeve and told me I had to help him hunt for his pistol. I told him to let me go; that father was coming, and that if he caught me out there he would kill me. He said, if he did, he would kill him. Very soon afterwards my father came up with a lantern in his hand, but nothing else. He (the father) asked what did all that mean. Defendant said: 'Stand back; I am a desperate man.' Varnell shot twice. He shot with a pistol. He got it from George Walker. Walker handed him the pistol." The sister Ella, to whom reference is made, did not testify in the case. It was shown that she is now deaf, and is in the asylum at Austin. There is testimony in the record tending to contradict some parts of this recital, and clearly presenting the issue of self defense; but for the purpose of disposing of the points raised on the charge of the court, it may be taken as the facts attending the homicide.

Having submitted to the jury the general rules of law relating to manslaughter, murder of the first and second degree, and of

self defense, the court charged as follows: "When one person kills another in defense of his life, or to protect his person from serious bodily injury, then in law such killing would be justifiable, provided the person who did the killing did not by his own unlawful act provoke the difficulty and bring about the excuse of taking the life of his assailant, in which case he would not in law be justifiable." Again: "If the defendant by his unlawful acts brought about the difficulty that led to the death of Jonas H. Land, then he would not be justified in killing said Land, because he, defendant, was in danger of losing his life or of suffering serious bodily harm at the hands of the said Land; but if the said difficulty was provoked by the defendant for the purpose of taking the life of said Land, and if the defendant killed him with express malice, it would be murder of the first degree; but if the killing was with implied malice, it would be murder of the second degree." * * *

If the accused provokes the combat—produces the occasion—in order to have a pretext to slay his adversary, or do him serious bodily harm, the killing will be murder, no matter to what extremity he may have been reduced in the combat. But if he provokes the combat or produces the occasion without any felonious intent—intending, for instance, an ordinary battery merely—the final killing in self defense will be manslaughter only. It will be seen from these rules that there must not only be a provoking of the combat, or a producing of the occasion, but the one or the other must be done intentionally—designed by and for the purpose of killing or inflicting serious bodily harm, or of engaging in an assault and battery. When this is the case, and the party is driven to kill to save his own life, having provoked the combat or produced the occasion for the purpose of slaying his adversary, he will not be permitted to urge his extremity as a necessity for the killing. But if there was no felony intended, he will be permitted to urge his extremity in order to reduce the killing to manslaughter.

The evidence in this record presents two theories: (1) That appellant killed Mr. Land when neither his life nor person was in danger, and in the absence of circumstances tending to reduce the homicide to manslaughter; (2) that the killing was in self defense. There is not a fact tending to show that appellant provoked the combat, or produced the occasion with the intention and for the purpose of killing or in any manner injuring Mr. Land; hence the above charge was without support

in evidence, and was clearly inapplicable to the case or to any phase of the case.

In another paragraph of the charge occurs the following: "The court instructs you that every man has the right to protect his minor daughter from debauchery; and if the defendant was at the house of Jonas H. Land, and sought to have carnal intercourse with one of the minor daughters of said Land, and if the said Land was killed while he was endeavoring to see that no such carnal intercourse should occur between the defendant and his daughter, and if the defendant killed him because of such interference, and such killing was done with express malice, * * * you will find defendant guilty of murder of the first degree. * * * If such killing was not done with express malice, then you will find defendant guilty of murder of the second degree." The evidence bearing upon this subject is that the appellant was at the social gathering, and that about eleven o'clock at night Miss Ella Land was missing from the dance. This seemed to create concern for her on the part of her father (deceased), her sister, now Mrs. Beasley, and some others, and they began to seek her. Mrs. Beasley came upon Varnell and Miss Ella Land about thirty or forty steps from the house. Ella Land and Varnell were evidently copulating, with Ella's consent. Mrs. Beasley took hold of Varnell; he arose, and Ella got up and left. After Ella had gone to the house, deceased came up, and the shooting occurred. Under this state of the case there is no possible reason, fact or circumstance requiring the above charge.

If deceased attempted to kill or assaulted the accused because of what had occurred between his daughter and the accused, the attempt or assault was not to prevent, but to revenge, what had already occurred. And while the act of Varnell was morally wrong, outrageous and infamous, still he was guilty of no offense against the law of this State, and had not forfeited his life to the father of Ella Land; nor had he lost his right to perfect self defense because of this matter, if he was entitled to it otherwise. It is preposterous to assume or indulge the hypothesis that Varnell intended to provoke a combat, or produce the occasion, in order to obtain a pretext to kill deceased, or inflict serious bodily injury, or any injury, upon him, by having carnal knowledge of his daughter with her consent, at night, thirty or forty yards from the house and away from the

·deceased.  The charge under discussion was wrong, was out of the case, was not supported by any evidence, and was very ·damaging to the appellant.  The appellant's conduct with Miss Ella Land was most fearfully calculated to prejudice his case with the jury—not legally, but unlawfully—and hence the ne-·cessity of proper instructions bearing upon this matter.  These were requested by counsel for appellant, and will be found in requested charge number three, which should have been given; ·or, if not strictly correct, a proper charge upon this subject should have been prepared by the court and submitted to the jury.

For the errors in the charge of the court, the judgment is re-·versed and the cause remanded.

*Reversed and remanded.*