

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-1039-14

**JOSE GUADALUPE RODRIGUEZ ELIZONDO, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE THIRTEENTH COURT OF APPEALS
### HIDALGO COUNTY

RICHARDSON, J., delivered the opinion of the Court in which MEYERS, JOHNSON, ALCALA, and NEWELL, JJ., joined. YEARY, J., filed a dissenting opinion in which KELLER, P.J., and HERVEY, J., joined. KEASLER, J., dissented.

### O P I N I O N

Appellant, Jose Guadalupe Rodriguez Elizondo, a U.S. Customs and Border Protection Agent, while off duty, shot and killed Fermin Limon Sr. Elizondo claimed self-defense, but the jury convicted him of murder, and he was sentenced to twenty-five years in prison. The Thirteenth Court of Appeals affirmed Elizondo's conviction. Elizondo petitioned this Court to review the appellate court's analysis of the alleged jury-charge

errors.[1]  We conclude that the court of appeals  erred by upholding the trial court's inclusion of a provoking-the-difficulty instruction in the jury charge.  Moreover, we hold that the trial court's erroneous inclusion of a provoking-the-difficulty instruction caused Elizondo "some harm."[2]  We therefore reverse the judgment of the Thirteenth Court of Appeals and remand the case to the trial court for a new trial.

## BACKGROUND—WITNESS TESTIMONY

On August 9, 2010, Appellant Jose Elizondo, his wife, Maria, and his brother, Juan, went to the Punto 3 nightclub around 12:45 a.m.  Elizondo and his wife became involved in an altercation with the owner of the nightclub, Fermin Limon Sr. ("Limon Sr."), his son, Fermin Limon Jr. ("Junior"), and some of the nightclub's security employees.  At some point during the fray, and purportedly to escape his attackers, Elizondo ran to his white Dodge Ram pickup truck, which was parked almost 70 yards away.  He was chased by three of the men. Elizondo then became involved in a physical struggle just outside the driver's side of his truck.  At that time he had his gun in his hand. Without warning, Limon Sr. approached Elizondo with a gun in *his* hand.  Each man was pointing his gun at the other. Elizondo claims that he shot Limon Sr. in self-defense.  The testimony regarding how these events unfolded differs from witness to witness.  As will become evident in our discussion of the

---

[1] Specifically, this Court granted review on two grounds: (1) the Court of Appeals should have analyzed all the elements of *Smith v. State* before determining that Elizondo provoked the second altercation; and (2) the Court of Appeals affirmed on a jury charge that was grossly incorrect by ignoring and then misapplying this Court's precedent.

[2] *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g).

legal issues raised, it is necessary to our analysis to set out the details of each witness's version of events.

### 1.    Francisco Garcia (Bar Security)

Francisco Garcia worked at Punto 3 as a general employee and security guard. Francisco testified that, at approximately 1:10 a.m., he was summoned by intercom and walkie-talkie to report to the bar section because a fight had broken out between two women. He, along with four other security guards, escorted two men and the two women who had been fighting to the nightclub's exit. Just after Francisco returned to the stage area in the club, he was summoned outside "because a fight broke out." He saw people arguing—"cussing and stuff." He did not see anyone being punched. He testified that the "ball of people" kept moving across the parking lot toward two white pickup trucks, a Dodge Ram pickup and a Ford F-150 pickup parked next to it. The female in the group was "pulling a male like let's go." Francisco said that he saw a male and female get inside the truck. No other witness testified that they saw Maria actually get into Elizondo's truck. Francisco said that two other bar security guards, Bryan Cruz and Rigo Hernandez Carreon, had approached the vehicle along with Junior. They were "banging on the windows." That's when he heard Bryan say, "Run. There's a gun." Elizondo then got out of the truck and began striking Junior. The female, who was on the passenger side, also got out of the truck. The female went towards the front of the truck where Elizondo was and pulled on his shirt yelling, "Let's go" and "Stop." Francisco said that, after Elizondo struck Junior, "the first gunshot went

off." "Moments after" he heard the first gunshot, Francisco saw Limon Sr. heading toward the white pickup truck, "walking fast towards that gunshot." Francisco testified that, when Limon Sr. got to that area, he saw "two guns being pulled out." Elizondo and Limon Sr. were pointing guns at each other. He heard Elizondo tell Limon Sr. to get on the ground, but Limon Sr. did not get on the ground. Francisco stated that he saw Limon Sr. hold the gun with one hand and gesture with his other hand "like, calm down." Francisco then heard more gunshots. At this time Junior was under the carport near the front of the nightclub. Francisco said that, after the gunshots, he saw Limon Sr. walk towards a Dodge Charger and collapse in front of it. Francisco said that he tried to help Limon Sr., but he heard more gunshots coming from the other side of the parking lot, so he ran back and took cover. Francisco said that he saw Rigo approach Limon Sr. and take his gun. Francisco testified that he saw Rigo run towards some cars in the parking lot, shoot Limon Sr.'s gun once, then when it jammed, Bryan took the gun and fired some shots. He testified that Limon Sr. did not shoot his weapon. Francisco admitted on cross-examination that when he first gave his statement to police, he said that he saw the group of people "fighting," which could mean more of a physical confrontation. Francisco also admitted that, when he gave his statement, he did not mention that a shot was fired by Elizondo before Limon Sr. went to the truck.

**2.      Rodrigo Hernandez Carreon (Bar Security)**

Rodrigo Hernandez Carreon ("Rigo") testified with the aid of a court interpreter. Rigo worked at the Punto 3 nightclub as a general employee and security guard. The prosecution

first questioned Rigo about his criminal record. Rigo is not a United States citizen. He has been deported several times, has served time in federal prison, and has served time in state prison for drug offenses, burglary of a vehicle, and evading arrest. Rigo was working on the night of the incident and testified in detail about what he observed. Rigo testified that he grabbed a lady and took her outside "because she was throwing punches" at another woman. When he was outside he saw that Limon Sr. had come outside to handle an argument. Limon Sr. was talking to a man in a hat and a woman. These people turned out to be Elizondo and his wife, Maria. Rigo said that the woman "was being disrespectful to Junior." She was saying things like, "idiot, stupid, sons of bitches." Rigo testified that the woman was "kind of hysterical." He said that "Junior disrespected her because it had already been about three or four times [that Junior had told the woman not to take her drink outside] and he had told her to stop." When asked at what point did "the man with the cowboy hat get disrespectful" towards Junior, Rigo answered, "When Junior disrespected the woman." Rigo then heard Elizondo say to Junior, "Well, son of a bitch, are you going to calm down or not," and "Don't disrespect my woman, you son of a bitch." Rigo testified that Elizondo then "hit [Limon Sr.] like this" (indicating that he hit him or pushed him). Rigo reacted by hitting Elizondo with his open palm. Elizondo then kicked Rigo. Rigo testified that no one else was hitting Elizondo. Rigo said that a woman then grabbed him from behind saying, "Don't hit him, stupid. Leave him alone." Rigo clarified that all of this talking and yelling was done in Spanish. Rigo said that Elizondo then started running, and he, Rigo, and Bryan Cruz, another

security guard, ran after Elizondo. Bryan Cruz did not testify at Elizondo's trial because he had been deported to Mexico. Rigo said that he was slower than Bryan because the woman was grabbing his shirt and had scratched him in the back. Rigo testified that he was yelling at Elizondo to "Stop, asshole," but that Elizondo did not stop. Rigo said that Elizondo "got in his truck, and he closed the door and locked it." At that time, Bryan told Rigo to "Be careful, be careful. He's got a gun." Rigo and Bryan ran back over toward the nightclub, but because the truck windows were not tinted, he could see that Elizondo "was desperately looking for something." Rigo said that Junior was behind him when he was chasing Elizondo. He said that "Junior got to the truck and was hitting the window telling him, 'Get off asshole.'" Rigo denied that he, too, banged on the truck. He testified that "Junior was by himself banging on the pickup." Then, another large man came up behind Junior and grabbed Junior from behind. Rigo observed that Elizondo then got out of the truck and started hitting Junior on the head and forehead "with a gun." Rigo testified that he moved closer to them because "it was two against one," and Rigo "tried to take the gun away" from Elizondo. Rigo said that when he tried to take the gun away from Elizondo, who was using it to hit Junior, Elizondo pushed at him with the gun and it went off: "Junior pushed him. And when he turned to this way, he shot at me once, like, to hit me but he didn't hit me . . . . If Junior didn't hit him with his head in the stomach he would have hit me." Rigo said that he "took off running." He testified that he then saw Limon Sr. approaching the truck with a gun, telling them, "Hey, calm down. Let's settle this problem." Rigo said that Limon Sr.

was holding the gun in one hand and gesturing Elizondo to calm down with the other hand. When asked how "the person with the weapon" reacted, Rigo said that "The person (Elizondo) hadn't seen [Limon Sr.], but when [Limon Sr.] got there [Limon Sr.] talked to [Elizondo] and the person (Elizondo) turned around." Rigo heard Elizondo tell Limon Sr., "Get to the ground, son of a bitch. Get to the ground . . . you dog." According to Rigo, before Limon Sr. could respond, Elizondo "instantly" fired his weapon. Rigo testified that Elizondo never identified himself as a federal agent. He did not remember seeing a woman because he "was focusing on the man." Rigo said that Limon Sr. walked over "in between the fence and the car" and fell. Rigo grabbed Limon Sr.'s gun through the chainlink fence. Rigo said that he loaded a bullet and pointed the gun, but it was locked so he did not fire it. Rigo then gave Bryan the gun and said that Elizondo was "still hitting Junior." Bryan then unlocked the gun and fired it twice. Rigo then grabbed the gun from Bryan and fired it three more times. Rigo testified that he was charged with tampering with evidence because he took Limon Sr.'s gun and hid it. He said he did that because he thought Elizondo might have been a drug dealer, and he was afraid.

### 3. Fermin "Junior" Limon Jr. (Limon Sr.'s Son)

Junior worked for the family business as a bartender. He testified that, on the night of the incident, his wife, who worked at the front counter, informed him that a woman (Maria) was trying to leave Punto 3 with an alcoholic drink. Junior claimed that he grabbed Maria's arm in an effort to stop her from leaving the bar with her drink because the bar could

get fined by the Texas Alcoholic Beverage Commission for allowing that. Junior said that he escorted Maria to the door and returned to the bar. At that point, his mother asked him to go outside and check on his father. Junior went outside and saw his father talking to two men (Elizondo and Juan) and the woman he had escorted to the door (Maria). Maria started screaming at Junior, calling him a "pendejo" and a "dumbass." Elizondo then called Junior a "pendejo." Limon Sr. told Elizondo not to insult his son. Junior testified that other employees, including Rigo and Francisco, were near the commotion. Junior said that, at that point, "one of the men went with his hand. He swiped his hands . . . . It hit my father." Three other security guards were present: Rigo, Bryan, and Pajaro. Rigo then struck Elizondo with the back of his hand, but no one else took a swing or started to attack. Junior testified that Elizondo then "took off running," and "Rigo and Bryan" took off after Elizondo. Junior said that he started chasing him as well and heard Elizondo shout, "Van a ver." Junior did not supply a translation at that time. On cross examination, Junior said that he heard Elizondo say "Vas a ver,"[3] and explained that, in English, the phrase means "You're going to see."[4] Junior claimed that he "got scared" and "felt it like a threat." Junior is the only witness at trial who testified that he heard Elizondo shout, "Van a ver." Junior said that he did not see Rigo or Bryan and did not hear either of them say that Elizondo had a gun.

---

[3] During testimony, both "van a ver" and "vas a ver" were used to describe what Junior heard Elizondo say.

[4] The appellate court supplied its own translation in its opinion, stating that "van a ver" means "you all will see." *Elizondo v. State*, 2014 WL 222834, at *4, n. 1 (Tex. App.—Corpus Christi 2014).

Junior testified that he got to the truck and "tapped the window" with his hand "because the man that was inside the truck was searching around." At that point, somebody grabbed Junior from behind in a headlock. He felt punches from "four hands hitting" him. As Junior was ducking down, he heard a shot. Once he heard that shot, they let go of him. Then he heard the person holding him in a headlock say that there was an officer. This was after he heard the gunshot. Junior began running back to the club. Junior testified at trial that he never saw his father approach the truck and never saw him with a gun, but he heard more shots after that first one. On cross-examination, Junior admitted that he had given an earlier statement that he had seen his father pull out a gun. Junior explained that he told the police what he had "heard," but it came out in the statement that it was what he "saw."

### 4. Juan Elizondo (Elizondo's Brother)

Juan said that he and a friend met Elizondo and Maria at Punto 3 nightclub around 12:45 a.m. Juan testified that, while he was at the nightclub, he observed two girls fighting over "some guy," so the girls were escorted out, and Juan was asked to go talk outside too. Elizondo had been with Juan at that time. After explaining the situation to Limon Sr., whom he thought was the head of security or a manager, Juan was allowed back inside the club, but Elizondo did not come back inside with him. As soon as he entered, Juan noticed people running out of the club. He heard his sister-in-law, Maria, yelling, and when he ran outside, he saw her "crying and yelling." Juan said Maria told him that Elizondo was getting "beat up," and he saw Elizondo running, and there were "some guys after him." Juan admitted

during trial that, although the report he gave to the Sheriff's Office said that there were "at least three guys hitting at him," he saw only one person take a swing at Elizondo. Juan also admitted that he did not see Elizondo get hit. Juan then said he ran toward where his brother was running—"It was like my brother, one security guard, another one, another one. It was like a line." And Elizondo's wife, Maria, was running over there, too. When Juan arrived at Elizondo's truck, he saw Elizondo and Junior struggling. Juan stated that he pulled Junior off Elizondo's back. The door to the truck was open. Elizondo was not inside his truck. Maria got to the truck and was with Elizondo near the open driver's side door. Juan said that he heard his brother yell, "U.S. Customs" and "Please put the gun down." (The interpreter said that, in Spanish, he was saying "Lower your pistol.") Juan testified that Elizondo said this twice. Juan then said that he heard two gunshots come from Elizondo's gun. At that point, Juan said he tried to "hide [him]self." Juan heard some shots that were not from Elizondo's gun, but from someone else's gun. Juan said that Elizondo then shot twice more "through the air," Juan repeated that Elizondo "shot twice and then someone shot at us. Well, I know someone shot back and then he shot twice." Juan testified that he did not know that Elizondo had shot anyone.

**5.      Maria Elizondo (Elizondo's Wife)**

Maria Elizondo testified through an interpreter. Maria testified that after they arrived at Punto 3, she saw her brother-in-law, Juan, go outside. She told Elizondo to go and check on his brother. She also testified that she saw two women fighting, but she stayed inside

talking to a friend. When some people started throwing bottles, Maria said that she went to the bar entrance. Maria had a drink in her hand, and when she got close to the door, she heard a woman standing there saying, "This stupid lady doesn't want to leave her drink behind." Maria said that she set her drink down, and as she was walking back to the bar entrance, she said that a security guard arrived, grabbed her, and told her, "I know the woman [*sic*] of your kind and get out," and he pushed her outside. She testified that she asked him why he was pushing her and he told her he knew "women like [her]" and pushed her again. She said she got offended and identified Junior to her husband as the one who had pushed her. Maria said that Elizondo then asked Junior, "Why were you pushing my wife?" Maria said that Junior became "angry" and "aggressive." She then testified that a security guard punched Elizondo in the face, and Elizondo then "got loose and he ran." Maria testified that there were "about six" men running after Elizondo "hitting him and hitting his feet from behind" yelling, "Stop asshole. Stop." Maria said that when she got to the truck she saw five men there, and Elizondo had a pistol. She saw that one of the "five men" also had a pistol, and her husband told him twice to "Lower your weapon." At that point she heard a shot and then more shots coming back towards her and her husband. She did not hear him identify himself as a U.S. Customs agent.

### 6.     Jose Elizondo (Appellant)

Elizondo testified in his defense. He stated that, he and his wife arrived at Punto 3 nightclub at around 1:00 a.m. in his white Dodge pickup. He stated that, as a licensed peace

officer, he has an assigned pistol from U.S. Customs, which was in the console of his pickup truck along with his credentials identifying him as a federal agent. Elizondo explained that, under federal law, he is authorized to carry a weapon at all times, but that he left the pistol and his credentials in his truck when they entered the nightclub.

In his statement that was read at trial and corroborated by him on the witness stand, Elizondo stated that, after he and his wife had danced some, he noticed some commotion in the area where they had been standing. His wife told him that his brother, Juan, was involved in the commotion. He walked over, grabbed his brother, and pulled him away and told him not to get involved. He saw two girls fighting. A man walked up to his brother and asked him to walk outside. He went with his brother. While Juan was talking to the man, Elizondo's wife came up to Elizondo looking "teary-eyed" and "in distress." When Elizondo asked her what was wrong, she told him that someone had pushed her "really ugly." Maria pointed to Junior as the one who had pushed her. Elizondo stated that he did not know Junior worked at the bar—he thought Junior was just another customer because he wasn't wearing a Punto 3 shirt. Elizondo asked Junior why he had pushed his wife and called Junior a "dumb ass." Elizondo said that Junior was cocky and became aggressive towards him. Elizondo then said that Junior pushed him, so Elizondo pushed back. Elizondo testified that "Rigo," a nightclub security employee, punched him in the face, and that there were four guys "swinging" and "grabbing," so he just started "going backwards." He felt several people punching him, and he started punching back. He could hear his wife telling them to

stop. Elizondo thought it was "a beating." Elizondo testified that he was worried that they would have continued beating him if he fell to the ground. His instinct was to get away to a safe place, so he turned and started running to his truck. Weeping on the witness stand, Elizondo admitted that he "didn't even remember [his] wife." Elizondo testified that they chased after him, trying to trip him; that he wasn't thinking of his gun; and that he just "wanted to get out of there." Elizondo testified that his aggressors were following him yelling, "Stop, asshole," but he did not stop running. He testified that, as he was running, he unlocked his truck with the remote key, and when he arrived at his truck, he got in, closed the door, and grabbed his gun out of the console.[5] Junior then opened the door, reached in and grabbed him and pulled him out before he could pull out his credentials. Elizondo testified that he started hitting Junior to protect himself. Elizondo admitted on cross examination that he used his weapon to hit Junior. Elizondo's brother, Juan, arrived and pulled Junior off of Elizondo. Elizondo testified that, at that point, Elizondo saw a man approaching his vehicle with a gun. The man turned out to be Limon Sr., and he was pointing his gun at Elizondo. Elizondo testified that he was afraid that Limon Sr. was going to shoot him. He insisted that he yelled "U.S. Customs" and told Limon Sr. at least two times to "throw the gun." Limon Sr. did not lower his gun, so Elizondo fired his gun, hitting Limon Sr. in the chest and leg. Elizondo claimed he had "no other choice" because he was

_____

[5] This testimony differs from the statement he gave to the Hidalgo County Sheriff's office. In his statement, Elizondo said that he did not get into his truck, but instead was simply reaching into it from the driver's side open door.

convinced Limon Sr. was going to shoot him. Elizondo fired two shots toward Limon Sr. He said that Limon Sr. "starts walking back," and his "wife is to [his right], she's on her knees, and she's just crying hysterically; she's crying, and so [he tries] to grab her, and [he] heard a shot from [his] left, which is right in front of the club." Elizondo said that he grabbed his wife and ran back and "took cover" behind a Tahoe SUV that was parked in front of his pickup truck. Elizondo then fired two shots into the air. Elizondo denied running to his truck to retaliate against the security guards. Elizondo did not mention in his statement or on direct examination that there may have been a first shot fired when he was struggling with Junior. In fact, on cross examination he denied that he had fired any shots before shooting Limon Sr. He also denied shooting at his own truck.

**7.      Oscar Gonzalez (Investigator with Higalgo County Sheriff's Office)**

Oscar Gonzalez, a crime-scene investigator with the Hidalgo County Sheriff's Office, was dispatched to the Punto 3 nightclub at approximately 2:00 a.m. on August 9, 2010. He arrived on the scene around 4:15 a.m. Upon arriving, Gonzalez was "told that there was a shooting out there, that a Customs agent was involved, and the owner of the bar was involved." The following information can be gleaned from Gonzalez's testimony and the State's exhibits admitted into evidence through Gonzalez:

•      Elizondo owned a .40 caliber handgun. The magazine to Elizondo's gun held a maximum of twelve bullets. Eight live bullets were recovered from the gun's magazine.

•      The holster for Elizondo's .40 caliber handgun was found on the ground next to the

open driver's side door of Elizondo's truck, a white Dodge Ram.

• Four empty .40 caliber shell casings were discovered on the scene. They were all located in the parking lot area near the driver's side door of Elizondo's truck. One casing was found under a white Ford F-150 pickup truck parked fire-engine-style in the parking space next to Elizondo's truck. Another casing was found under a Ford F-250 pickup truck parked on the other side of the F-150. The other two empty shell casings were found in the parking lot area next to a Tahoe SUV parked nose-to-nose in front of Elizondo's truck.

• There was a bullet entry hole in the side of Elizondo's truck on the driver's side to the left of the gas tank lid. There was another bullet entry hole on the inside of the truck's bed above the passenger side rear tire well. The testimony was not clear as to whether there were exit holes.

• There were bullet fragments, a damaged "projectile," and copper bullet jackets found on the ground near the passenger side of Elizondo's truck.

• A black Dodge Charger was parked next to a chainlink fence in the same parking lot area. There was blood on the ground near the Dodge Charger. An orange ostrich hat band that had belonged to Limon Sr. was found next to the Dodge Charger.

• Limon Sr. owned a 9-millimeter handgun.

• Five empty 9-millimeter shell casings were found on the scene. Two were found directly in front of Punto 3's front door area. A third was found near the Black Dodge Charger along the chainlink fence. The remaining two 9-millimeter empty shell casings were also found in the parking lot in front of the bar near the chainlink fence.

• Elizondo's pickup truck was parked approximately 67 yards from the front door of the nightclub.

**8.      Richard Parent (Forensic Scientist, Texas Department of Public Safety)**

Dr. Richard Parent, a forensic scientist in the firearms and toolmark section at the

McAllen Regional Crime Lab, testified as an expert witness. He identified Elizondo's gun

as a .40 caliber Smith and Wesson, model P2000 handgun manufactured by Heckler and Koch. He identified Limon Sr.'s gun as a 9-millimeter Luger, model PT2709 handgun manufactured by Taurus. Dr. Parent confirmed that the "projectile" recovered from the ground near the passenger side of Elizondo's truck came from Elizondo's .40 caliber gun. He also confirmed that the two bullets recovered from the body of Limon Sr. came from Elizondo's .40 caliber gun.

**9.      Trooper Christopher Michael Champion**

Trooper Christopher Michael Champion, with the Texas Highway Patrol, testified that he was the first officer on the scene after the shooting. Trooper Champion said that Elizondo was cooperative, and, although he smelled of alcohol, he did not seem to be intoxicated—he had not "lost his normal physical faculties." He also testified that, although Elizondo told him that he had been punched in the mouth, Trooper Champion did not see any type of bruising or cuts to Elizondo's lip. Elizondo also told Champion that he had been kicked in the head by several individuals, but Elizondo still had his cowboy hat on, and Elizondo had no torn clothing or any bruising. Elizondo also told Trooper Champion that they had him on the ground, they were beating on him, he feared for his life, and so he ran to his truck:

> He told me that they were coming after him, he pulled—he went to his vehicle, he got his gun, he grabbed it; he said that he stated that he was U.S. Customs and Border Protection and that he pointed the gun; and when he pointed the gun he saw the victim reach behind his back, I believe is what he said; he pulled out what he believed was a gun and he shot him; and then he told me—I believe he said three times or I believe he said he shot three times at the subject.

Trooper Champion testified that he did not believe that Elizondo had been assaulted.

## ON DIRECT APPEAL

On direct appeal to the Thirteenth Court of Appeals, the first issue raised by Elizondo was that the evidence was legally insufficient to support the jury's rejection of self-defense. In resolving Elizondo's sufficiency challenge, the court of appeals addressed provocation by holding that "[a] reasonable jury could have believed that Elizondo provoked the fight, which would have made self-defense unavailable."[6]  In the context of his sufficiency challenge, Elizondo argued  that, even if he had provoked the fight, he abandoned that first encounter in front of the bar by running to his truck.  The appellate court concluded, however, that a reasonable jury could have found otherwise because the evidence that Elizondo was yelling, "Van a ver," (translated by the appellate court as, "You all will see"), supported the conclusion that Elizondo was running to his truck to retrieve his gun, not to abandon or discontinue the fight.

Elizondo's second issue raised on direct appeal was that the jury charge was erroneous and harmful.  He complained, as he does before this Court, that the jury charge on self-defense was erroneous because: (1) it included a provocation instruction over Elizondo's objection; (2) it did not include all of the presumptions of reasonable force as provided by section 9.32 of the penal code; (3) it improperly stated the provocation instruction; (4) it failed to include an instruction on "threats as justifiable force"; and (5) it failed to include

---

[6]  *Elizondo v. State*, 2014 WL 222834, at *6 (Tex. App.—Corpus Christi 2014).

any reference to multiple assailants.[7] With regard to Elizondo's challenge to the inclusion of the provocation instruction, the appellate court held "that the trial court did not err when it submitted the provocation instruction to the jury because there was sufficient evidence to raise this issue."[8] With regard to Elizondo's other challenges to the jury charge, the appellate court decided that, to the extent there were errors in the self-defense charge, such errors were harmless. Today, our task is to determine whether the jury in this case was properly charged on the issues of self-defense and provocation, and whether the appellate court correctly analyzed the purported jury-charge errors.

## ANALYSIS

It is undisputed that an argument broke out just outside the bar between Elizondo and Junior. Other bar security guards, along with Limon Sr., were involved, both as participants in, and witnesses to, the argument. There may have been a swing by Elizondo, some shoving, and a punch or slap. Elizondo ran away from the group, toward his truck parked nearly 70 yards away. Others involved in the altercation followed Elizondo to his truck and ended up in a struggle near the truck—how many were involved in that struggle varies by witness testimony. Whether Elizondo had run to his truck to get away from his so-called attackers, or to retrieve his gun, was in dispute. What was undisputed was the fact that, just before Elizondo shot and killed Limon Sr., each man was pointing a gun at the other.

---

[7] *Id.* at *7.

[8] *Id*. at *8.

## A.    Provoking the Difficulty—A Limitation On The Right of Self-Defense

Under Section 9.31 of the Texas Penal Code, a person may justifiably use force against another when he reasonably believes that the force is immediately necessary to protect himself from the other person's use or attempted use of unlawful force.[9] Section 9.32 provides, in pertinent part, that a person is justified in using *deadly* force against another if he would be justified in using force under Section 9.31, and when and to the degree he reasonably believes the deadly force is immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force.[10] "A defendant is entitled to an instruction on self-defense if the issue is raised by the evidence, whether that evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the defense."[11] However, a defendant may forfeit his right to self-defense if he provokes the attack.[12]

### 1.    *Smith v. State*[13]

The portion of the self-defense statute regarding provocation is a limitation on a defendant's right to self-defense. "The rule of law is that if the defendant provoked another to make an attack on him, so that the defendant would have a pretext for killing the other

---

[9] TEXAS PENAL CODE § 9.31(a).

[10] TEXAS PENAL CODE §§ 9.32(a)(1) and (a)(2)(A).

[11] *Ferrel v. State*, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001) (citing to *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999); *Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996)).

[12] TEXAS PENAL CODE § 9.31(b)(4).

[13] 965 S.W.2d 509 (Tex. Crim. App. 1998).

under the guise of self-defense, the defendant forfeits his right of self-defense."[14] Elizondo claims in his petition for discretionary review that the court of appeals erred because it did not analyze all three elements of provoking the difficulty, set forth in *Smith v. State*, before it determined that there was sufficient evidence that Elizondo provoked the fight. Under this Court's holding in *Smith*,

> a charge on provocation is required when there is sufficient evidence
>
> (1)  that the defendant did some act or used some words that provoked the attack on him,
>
> (2)  that such act or words were reasonably calculated to provoke the attack, and
>
> (3)  that the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting harm upon the other.[15]

We concluded in *Smith* that "[a]n instruction on provocation should *only* be given when there is evidence from which a rational jury could find *every element* of provocation beyond a reasonable doubt."[16] If the facts do not support giving the charge on provoking the difficulty

---

[14] *Id.* at 512.

[15] *Id.* at 513.

[16] *Id.* at 514 (emphasis added). In *Smith v. State*, on an indictment for murder, a jury convicted Smith of manslaughter. At trial, the evidence raised the issue of self-defense, and, over Smith's objection, the jury charge on self-defense included provoking the difficulty. The appellate court upheld his conviction. Smith argued before this Court that the court of appeals erred by holding that the provocation instruction was properly given, because there was insufficient evidence to raise the issue of provocation. This Court disagreed, affirmed the decision of the court of appeals, and held that, because "a rational jury could have found every element of provocation beyond a reasonable doubt, . . . the trial court properly submitted the [provocation] issue to the jury. . . ." *Id.* at 520.

(i.e., a rational jury could not find all three elements of provocation beyond a reasonable doubt), then the provocation instruction must not be submitted to the jury. Including it in the jury charge would constitute an unwarranted limitation on the right of self-defense, i.e., trial court error.[17] Therefore, when it comes to the issue of instructing the jury on provoking the difficulty, trial court judges must beware.[18] This standard does not require the judge to encroach on the jury's role as factfinder. It does not require the judge to assess the credibility or strength of the evidence. It simply requires the judge to decide whether evidence has been presented that *could* support a jury's finding of all three elements of provocation beyond a reasonable doubt.

### 2.     How The Appellate Court Analyzed Provocation

In this case, in determining whether the trial court properly included a provocation instruction in the jury charge, the court of appeals was required to address all three of the *Smith* elements. "Under such an analysis the appellate court asks if there was sufficient evidence from which a rational jury could have found provocation beyond a reasonable doubt, viewing the evidence in the light most favorable to giving the instruction."[19] The court of appeals correctly cited to *Smith* in its discussion of Elizondo's first issue raised on direct appeal regarding legal sufficiency:

---

[17] *Matthews v. State*, 708 S.W.2d 835, 837 (Tex. Crim. App. 1986).

[18] *See Smith*, 965 S.W.2d at 513 ("[E]very trial judge of any experience knows that submitting such a charge to a jury is fraught with difficulty and the chance of error is great.") (citing to *Dirck v. State*, 579 S.W.2d 198, 203 n. 5 (Tex. Crim. App. 1979)).

[19] *Smith*, 965 S.W.2d at 514.

Provoking the difficulty, as the doctrine of provocation is commonly referred to in our jurisprudence, is a concept in criminal law which acts as a limitation or total bar on a defendant's right to self-defense. The phrase "provoking the difficulty" is a legal term of art, and more accurately translates in modern usage to "provoked the attack." The rule of law is that if the defendant provoked another to make an attack on him, so that the defendant would have a pretext for killing the other under the guise of self-defense, the defendant forfeits his right of self-defense.[20]

In addressing Elizondo's second issue raised on direct appeal—that the jury charge erroneously included a provocation instruction over his objection—the court of appeals cited to *Matthews v. State*,[21] an opinion that this Court rendered twelve years before deciding *Smith*:

> In *Matthews v. State*, the Texas Court of Criminal Appeals held that a provocation charge is proper when: (1) self defense is an issue; (2) there are facts in evidence which show that the deceased made the first attack on the defendant; and (3) the defendant did some act or used some words intended to and calculated to bring on the difficulty in order to have a pretext for inflicting injury upon the deceased. The determination to include the instruction "is limited to whether there is any evidence raising the issue." "Words alone may provoke the difficulty, thereby justifying a provocation charge."[22]

Significantly, in *Smith v. State,* this Court opined that the above holding in *Matthews* needed further clarification:

---

[20] 2014 WL 222834, at *6 (citing to *Smith*, 965 S.W.2d at 512, and to TEX. PENAL CODE § 9.31(b)(4), which provides as follows: "(b) The use of force against another is not justified: . . . (4) if the actor provoked the other's use or attempted use of unlawful force, unless: (A) the actor abandons the encounter, or clearly communicates to the other his intent to do so reasonably believing he cannot safely abandon the encounter; and (B) the other nevertheless continues or attempts to use unlawful force against the actor.")

[21] 708 S.W.2d 835 (Tex. Crim. App. 1986).

[22] 2014 WL 222834, at *7 (citing to *Matthews*, at 837-38, which cited to *Morrison v. State*, 256 S.W.2d 410 (Tex. Crim. App. 1953)).

The enumeration of circumstances in *Matthews* did not much clarify the doctrine of provocation. The first circumstance is a threshold question for allowing the charge, and the second circumstance is a necessary predicate of the first. Neither is part of the issue of provocation itself. *The third circumstance embodies the doctrine of provocation, and we take this opportunity to clarify when the issue properly should be submitted to the jury.*

A charge on provocation is required when there is sufficient evidence (1) that the defendant did some act or used some words which provoked the attack on him, (2) that such act or words were reasonably calculated to provoke the attack, and (3) that the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting harm upon *the other*.

All of the elements are questions of fact. . . . The doctrine of provocation is codified in Section 9.31(b)(4) of the Penal Code, and has its roots in the common law. It is founded upon the theory of estoppel and based upon the legal maxims that, "A man may not take advantage of his own wrong to gain favorable interpretation of the law; he seeks the law in vain who offends against it. . . . [O]ne cannot willingly and knowingly bring upon himself the very necessity which he sets up for his own defense." . . . Although not specifically stated in the current statute, the common law element of intent is still required under the current codification.

*An instruction on provocation should only be given when there is evidence from which a rational jury could find every element of provocation beyond a reasonable doubt.*[23]

With regard to the first of the three *Smith* elements, there must be some evidence from which a rational jury could find beyond a reasonable doubt that some act or words of the defendant actually caused the attack on him.[24] In addition, acts or words directed at a third

---

[23] *Smith*, 965 S.W.2d at 513-14 (emphasis added; citations omitted).

[24] *Id.* at 514 (citing to *Matthews*, at 838).

party may likewise provoke a difficulty.[25]   In this case, the appellate court held that "a reasonable jury could have believed" not only that Elizondo provoked the initial difficulty, but that Elizondo's "running to his truck was to retrieve his firearm, not to abandon or discontinue the fight."[26]   We find that the court of appeals properly addressed this first element of the *Smith* inquiry by pointing to testimony given by Rigo and Junior regarding Elizondo's words and actions that could have provoked the attack on him.

The second *Smith* element justifying an instruction on provoking the difficulty is that the defendant's actions or words were reasonably calculated to provoke the attack.  Even if acts or words may cause an attack on the defendant, if such acts or words were not reasonably calculated to do so, the defendant will not lose his right to self-defense.[27]   As we held in *Smith*, "[a]n act is reasonably calculated to cause an attack if it is reasonably capable of causing an attack, or if it has a reasonable tendency to cause an attack."[28]   Moreover, words alone may provoke a difficulty if they are clearly designed to do so.[29]   In this case, this element is satisfied if there is some evidence from which the jury could rationally conclude beyond a reasonable doubt that Elizondo's acts or words—taken alone or considered in

---

[25] *Id.* (citing to *Bennett v. State*, 726 S.W.2d 32, 36 n. 3 (Tex. Crim. App. 1986) (holding that an accused could "be found to have provoked the difficulty with the intent to kill his adversary by words or acts, or both, directed at a third party, so long as they were calculated to provoke and did provoke his adversary, just as the accused intended")).

[26]  2014 WL 222834, at *6.

[27] *Smith*, 965 S.W.2d at 517.

[28] *Id.*

[29] *Id.* (citing to *Morrison v. State*, 256 S.W.2d 410, 411 (Tex. Crim. App. 1953)).

conjunction with the relations of the parties and other circumstances surrounding the difficulty—were reasonably *capable* of causing the attack or had a reasonable tendency to cause the attack on him.[30]

The appellate court did not expressly address this second element of *Smith*. However, the appellate court discussed, in great detail, the testimony of the witnesses and the evidence regarding the confrontation between Elizondo and the others. The appellate court concluded that "a reasonable jury could have believed that Elizondo provoked the fight," and "a reasonable jury could have found" that Elizondo did not abandon the first encounter, but was running to his truck to get a gun in continuation of the fight that began just outside the bar.[31] The witness testimony describing Elizondo's words and actions toward Junior, as well as that of his acts of physical violence in swinging to hit Limon Sr., retrieving his gun, and hitting Junior with his gun outside his truck, could have supported the conclusion that Elizondo's acts and words were reasonably capable of causing, or had a reasonable tendency to cause, Limon Sr. to approach with his gun pointed at Elizondo. We hold that the appellate court's discussion adequately encompassed this second element of *Smith*.

### 3.    The Appellate Court Failed to Properly Analyze the Third *Smith* Element

The third element supporting a provoking-the-difficulty instruction requires that there be some evidence from which a rational jury could find beyond a reasonable doubt that the

---

[30] *Id.*

[31] *Elizondo*, 2014 WL 222834 at *6.

act was done, or the words were used, for the purpose and with the intent that the defendant would have a pretext for killing the victim. "Even though a person does an act, even a wrongful act, which does indeed provoke an attack by another, if he had no intent that the act would have such an effect as part of a larger plan of doing the victim harm, he does not lose his right of self-defense."[32]

This third element of intent has long been a part of the common-law doctrine of provoking the difficulty. In the 1938 decision of *Norwood v. State*, this Court held that,

> If the appellant, by his own act or conduct, did something with the intention of provoking a difficulty and it was reasonably calculated to provoke the deceased to make an attack upon the appellant which he, appellant, might use as a pretext for the killing of the deceased, then he forfeited his right of self-defense. What his intentions were was concealed within his own mind and can only be determined from his words, acts, and conduct. If they were such as would reasonably lead a dispassionate mind to the conclusion that he intended to provoke a difficulty for the purpose of killing the deceased, then the testimony was sufficient to submit the issue to the jury for their determination.[33]

In *Smith*, we held that the Legislature's codification of provocation did not eliminate the common-law element of intent—"[a]lthough not specifically stated in the current statute, the common-law element of intent is still required under the current codification."[34] When *Smith* was decided in 1998, Section 9.31(b)(4) provided that

---

[32] *Smith*, 965 S.W.2d at 518.

[33] 120 S.W.2d 806, 809 (Tex. Crim. App. 1938).

[34] *Smith*, 965 S.W.2d at 514 (citations omitted). The version of Section 9.31(b)(4) in effect at the time of this offense is worded identically to the version of Section 9.31(b)(4) that was cited in the *Smith* opinion. *See supra* note 20.

(b) The use of force against another is not justified: . . . (4) if the actor provoked the other's use or attempted use of unlawful force, unless: (A) the actor abandons the encounter, or clearly communicates to the other his intent to do so reasonably believing he cannot safely abandon the encounter; and (B) the other nevertheless continues or attempts to use unlawful force against the actor.[35]

When this offense was committed in August of 2010, the wording of Section 9.31(b)(4) had not changed.[36] And today, the wording of Section 9.31(b)(4) still has not changed.[37] "We presume that the Legislature intends the same construction to continue to apply to a statute when the Legislature meets without overturning that construction."[38] We therefore continue to hold that the third *Smith* element of intent has not been statutorily eliminated.[39] In this

---

[35] Acts of May 23, 1995, 74th Leg., R.S., ch. 190, § 1, 1995 Tex. Gen. Laws 1919, 1919 (codified at TEX. PENAL CODE § 9.31(b)(4)).

[36] Acts of Mar. 27, 2007, 80th Leg., R.S., ch. 1, § 2, 2007 Tex. Gen. Laws 1, 1 (codified at TEX. PENAL CODE § 9.31(b)(4)).

[37] TEX. PEN. CODE § 9.31(b)(4) (West 2011).

[38] *Awadelkariem v. State*, 974 S.W.2d 721, 725-26 (Tex. Crim. App. 1998), *overruled in part by Kirk v. State*, 454 S.W.3d 511, 515 (Tex. Crim. App. 2015).

[39] Because *Smith* answered the question whether the common-law element of intent survived the codification of the provocation doctrine, we do not find it necessary to re-explore that issue. However, even if we did, we would analyze this issue consistently with our reasoning in *Garcia v. State*, 387 S.W.3d 20 (Tex. Crim. App. 2012), but would reach a different result. In *Garcia*, we determined that the common-law requirement that the State exercise due diligence in prosecuting a motion to revoke community supervision did not survive codification of that matter because the common-law requirement of due diligence was expressly replaced by Texas Code of Criminal Procedure article 42.12, section 24, which we refer to as the "due diligence" statute. In 2003, article 42.12 was amended to extend the trial court's jurisdiction over revocation proceedings beyond the expiration of a defendant's community supervision so long as, before that time, the State has filed a motion to revoke, continue, or modify community supervision and a capias has issued. We held that section 21(e) effectively codified the corresponding common-law requirement, but it did not codify the common-law due- diligence defense. However, at the same time, the Legislature also added section 24 to article 42.12, which expressly created a due-diligence affirmative defense to revocation. Even then, we still decided that it was unclear whether the Legislature intended to eliminate the common-law

case, in order to support the giving of a provoking-the-difficulty instruction in the jury charge, there had to be evidence raised from which a rational jury could find beyond a reasonable doubt that Elizondo possessed an intent to provoke so he would have a pretext to harm Limon Sr. under a guise of self-defense.

A defendant's intentions can be determined from his words, acts, and conduct, occurring before, during, or after the provocation.[40] Intent is a fact question to be determined from all the circumstances. The acts of provocation alone can carry the inference of intent, and Elizondo's actions during or after the provocation can illuminate his intent. Elizondo's prior acts can also give character to what he said or did at the time of the homicide, which

---

due-diligence defense *entirely*. Therefore, we turned to extra-textual factors to determine the Legislature's intent. *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991). In light of the legislative history, and the interpretations given to those amendments by the courts of appeals that have analyzed the issue, we concluded that the 2003 addition of section 24 was intended to completely replace the common-law due-diligence defense.

      In this case, even if we were to revisit the issue which we had already decided in *Smith*—that the common-law element of intent is still required under the doctrine of provocation—we find no indicators that there was any legislative intent to eliminate that element. We continue to follow the well-established rule that "a statute must not be interpreted as abrogating a principle of the common law unless such overruling is clearly indicated, either by the express terms of the statute or by necessary implication from the language used." *Enos v. State*, 889 S.W.2d 303, 305 (Tex. Crim. App. 1994); *Manning v. State*, 730 S.W.2d 744, 747-48 (Tex. Crim. App. 1987) (recognizing that even when common law rules regarding competency and sanity are codified, if the rules concerning burden shifting have not been incorporated into the statute, then those common law rules remain the same).

      Moreover, for the past 18 years appellate courts have been following our holding in *Smith*, requiring all three elements before a provocation instruction could be included in the jury charge. *See*, *Mayes v. State*, 2014 WL 5760688, *3 (Tex. App.—Amarillo 2014, pet. ref'd) (quoting *Smith*, "the common law element of intent is still required under the current codification"); *Mendoza v. State*, 349 S.W.3d 273, 279-80 (Tex. App.—Dallas 2011, pet. ref'd); *Staley v. State*, 2010 WL 2680000, *5 (Tex. App.—San Antonio 2010, pet. ref'd); *Dorsey v. State*, 2009 WL 3491013, *5 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd).

[40] *Smith*, 965 S.W.2d at 514.

can aid in both explaining Elizondo's words or acts and determining his intent.

The court of appeals did not properly address this third element. The appellate court, as well as both parties, incorrectly focused on the issue of abandonment of the encounter—specifically, whether there had been an abandonment by Elizondo of the first argument just outside the bar.[41] Much of Elizondo's argument regarding the appellate court's failure to correctly analyze the provocation instruction under *Smith* centered on there being two separate altercations. Elizondo argued that, by running to his truck, he was abandoning the initial fight outside the bar. Thus, he claims, the provocation instruction was not warranted because there was no evidence that he did anything to provoke the second altercation, which was the one that resulted in him shooting Limon Sr. The State responded that this was one continuous fight and that Elizondo did not communicate his intent to abandon the initial provocation. The State emphasized that Elizondo's shouting, "Van a ver," showed that there was one continuous altercation. The court of appeals agreed with the State, holding that a reasonable jury could have found that Elizondo was running to his truck for his firearm—not to abandon or discontinue the initial fight—and without abandonment, there was no second altercation.

However, the focus on whether there was an abandonment of the encounter was misplaced. A jury should be instructed on the issue of abandonment *only if provocation applies in the first place*. Even if we agree that Elizondo's shouting, "Van a ver," was not

---

[41] *See* TEX. PENAL CODE § 9.31(b)(4)(A) and (B).

an abandonment of the initial confrontation, there must be evidence from which a rational jury could find that Elizondo used self-defense as a pretext for killing Limon Sr. The appellate court's discussion of whether there was evidence that Elizondo abandoned the initial encounter does not adequately address whether this third element of *Smith* was met. The record must show that there was evidence from which a rational jury could find beyond a reasonable doubt that Elizondo intended his acts to have a provocative effect "as part of a larger plan of doing [Limon Sr.] harm."[42] Even if Elizondo had shouted "Van a ver," there was nothing in the record to suggest that Limon Sr. could have heard it, did hear it, and/or was reacting to it when he approached Elizondo with a gun in his hand.

Therefore, rather than focusing on the issue of abandonment, the court of appeals should have addressed whether there was evidence that Elizondo had the intent to provoke Limon Sr. into attacking him, so that Elizondo could claim that he was justified in shooting Limon Sr. in self-defense. Although a finding of insufficient evidence to support a jury's finding of intent occurs only in a few "exceptional and extraordinary situations," there must still be a determination by the reviewing court that the trial court correctly decided that there was evidence raised that supported giving the provoking-the-difficulty instruction.[43]

In resolving the issue of whether the provocation instruction was properly given, the appellate court relied on the following four pieces of evidence: (1) Rigo's testimony "that

---

[42] *Smith*, 965 S.W.2d at 518.

[43] *Id.*

Elizondo told Junior, 'Don't disrespect my woman, you son of a bitch,' and 'Well, son of a bitch, are you going to calm down or not?'"; (2) Junior's testimony "that Elizondo called him a '*pendejo*' or 'dumbass'"; (3) Rigo's and Junior's testimony that "Elizondo swung, hitting Limon Sr."; and (4) Junior's testimony that Elizondo was yelling, "Van a ver," ("You will see") while running to his truck.[44] The appellate court found that this evidence raised the issue of provocation and supported finding that Elizondo provoked the difficulty and did not abandon the encounter. However, we fail to see how this evidence would support a jury's finding that Elizondo acted with the intent, and as part of a larger plan, to kill Limon Sr. There was nothing in the appellate court's analysis specifically discussing the third *Smith* element. Therefore, the appellate court erred by not fully and properly addressing whether Elizondo's actions were done and/or words were said with the intent and as part of a larger plan to harm Limon Sr.

Although a jury can rely upon wholly circumstantial evidence to find provoking acts or words,[45] such evidence must create more than a suspicion because juries are not permitted to reach speculative conclusions. Here, the circumstantial evidence, taken as a whole, is such that a finding by the jury of provoking acts or words on the part of Elizondo, that were done or said as a pretext for killing Limon Sr., would amount to nothing more than impermissible speculation. Elizondo did not know Limon Sr. Elizondo did not seek out Limon Sr. There

---

[44] *Elizondo*, 2014 WL 222834 at *6-8 (emphasis in original).

[45] *Smith*, 965 S.W.2d at 515-16.

was no evidence that the argument was initiated by Elizondo as a ruse to get Limon Sr. to attack him so that Elizondo would have a reason to kill Limon Sr. in self-defense. There was no evidence that, when Elizondo ran to his truck, he was goading Limon Sr. into following him and attacking him. Even viewing the evidence in a light most favorable to giving the instruction, we conclude that the evidence was insufficient for a reasonable jury to find, beyond a reasonable doubt, that Elizondo did or said something with the purpose and intent of creating a pretext for shooting Limon Sr. under the guise of self-defense.[46] In this case, as was in the case in *Bennett v. State*,[47] there was insufficient evidence of provocation, as

---

[46] *Cf, Vise v. State*, 2015 WL 575160, *4 (Tex.App.—San Antonio 2015, no pet.) (Defendant and victim lived together as boyfriend and girlfriend. They fought. The victim testified that the defendant told her that if she hit him like a man, then he would hit her back like one. The court found that this satisfied the third element of *Smith*.); *Cherry v. State*, 2014 WL 265844, *6 (Tex.App.—Houston 1st Dist 2014, no pet.) ( Cherry was drunk, man-handled Schall, and hit her arm with the door. Despite repeated requests to leave, Cherry remained at the trailer. Cherry's refusal to leave and pushing Couchman support the jury's conclusion that Cherry intended to harm Couchman.); *Yougas v. State*, 2008 WL 2791517, *3 (Tex. App.—Dallas 2008, pet. ref'd) (Given appellant's words and conduct, including trading insults with the victim, asking him to "come outside," his decision to arm himself before confronting the victim, and the history of animosity between them, the jury could have reasonably inferred that he had the necessary intent); *Tran v. State*, 2014 WL 859674, *7 (Tex. App.—Texarkana 2014, pet. ref'd) (Defendant and victim were seated next to each other at a nightclub. Defendant said something insulting to victim. Victim punched Defendant. Defendant had a gun. "Given that Tran shot Nguyen less than one minute after these words were spoken, the jury could easily infer that Tran's words were spoken with the intent to create a pretext for inflicting harm on Nguyen."); *Oakes v. State*, 2010 WL 668541, *4 (Tex. App.—Amarillo 2010, no pet.) (Appellant and his brother engaged in a fist fight after drinking at a bar. There was a history of animosity between the brothers. Appellant went to his truck and got a gun and shot it in the air, at which time the brother came over to him and they continued to fight verbally. The fight ended when appellant shot his brother in the chest. The jury could have seen appellant's conduct with the gun as escalating the fight, causing it to continue rather than be abandoned. A rational jury could have concluded that appellant retrieved and fired his pistol in the air with the intention of provoking his brother into further fighting.).

[47] 726 S.W.2d 32, 36 (Tex. Crim. App. 1986) (holding that the evidence was insufficient to show Bennett provoked a man he did not know into attacking him so that Bennett could kill this man).

there was no evidence that Elizondo orchestrated a set of events as a ploy to kill Limon Sr., a man he did not know. Although Elizondo's actions may have prompted Limon Sr. to approach Elizondo with a gun in his hand, "it is impossible to fathom, under the facts as stated in the case, that [Elizondo] arranged this set of events to bring on such an attack."[48] Therefore, we hold that the Thirteenth Court of Appeals erred in holding that the trial court properly included an instruction in the jury charge on provoking the difficulty.[49]

**B.      Did Elizondo Suffer "Some Harm" As A Result of The Provocation Instruction?**

Because we have concluded that the trial court erred by including an instruction in the jury charge on provoking the difficulty, the next step in reviewing a claim of jury charge error involves a harm analysis under *Almanza v. State*.[50] In cases where the court of appeals has not reached the issue of harm, it is our general practice to remand the case to the appellate court for a harm analysis.[51] However, "harm is always an issue properly before this Court whenever error is discovered."[52] In this case, the court of appeals had no problem with the *giving* of a provocation instruction, but held that the provocation instruction that was

---

[48] *Smith*, 965 S.W.2d at 519 (citing to *Varnell v. State*, 26 Tex. App. 56, 9 S.W. 65 (1888)).

[49] This is why it was necessary for us to set out the facts of the case in tedious detail, and to recount the variations—some extreme, some minuscule—among the witnesses's versions of the events. A conclusion that there was *enough* evidence may not have required such an in-depth examination of the evidence, but our conclusion that there was *no* evidence to support a finding of the third element of *Smith* required us to examine *all* of the evidence.

[50] 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g).

[51] *See Van Hoang v. State,* 939 S.W.2d 593 (Tex. Crim. App. 1996).

[52] *Miller v. State*, 815 S.W.2d 582, 586 n. 2 (Tex. Crim. App. 1991).

given was erroneously worded. The court of appeals conducted a limited harm analysis, finding that no harm was caused by the erroneously worded provocation instruction. We find that there is no "legitimate reason" for remanding this case for a harm analysis caused by the trial court's erroneous inclusion of a provocation instruction, since the court of appeals failed to find harm in the incorrectly worded instruction.[53] It would therefore make no sense, at this juncture, to send the case back to the appellate court.

Because Elizondo objected to the provocation charge at trial, he is entitled to a reversal of his conviction if the record shows that he suffered "some harm" as a result of the inclusion of the provocation instruction.[54] Specifically, if including a provocation instruction was "calculated to injure the rights" of Elizondo, reversal must be ordered.[55] Neither Elizondo nor the State has the burden with regard to showing or proving harm. We must

---

[53] *See*, *Saenz v. State*, 843 S.W.2d 24, 30 (Tex. Crim. App. 1992) (Baird, J. concurring in part and dissenting in part).

[54] *Almanza*, 686 S.W.2d at 171. *See Garza v. State*, 126 S.W.3d 79, 82 (Tex. Crim. App. 2004) (noting that, "to preserve error, the record must show that appellant made a timely request, objection, or motion, and that the trial court ruled on it) (citing to TEX. R. APP. P. 33.1(a)(1)). *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013) (noting that, if the defendant did object at trial, he will obtain relief if the record shows that he suffered "some harm") (citing to *Almanza*, 686 S.W.2d at 171); *Vogel v. State*, No. PD-0873-13, 2014 WL 5394605, *4 (Tex. Crim. App. 2014) (holding that statutory rights, when properly asserted at trial through proper objection, are entitled to review under the "some harm" analysis). *See also Burns v. State*, 703 S.W.2d 649, 651 (Tex. Crim. App. 1985) ("This has been interpreted to require only that *some* harm have resulted to appellants because of the erroneous charge.") (emphasis in original) .

[55] TEX. CODE CRIM. PROC. ANN. art. 36.19; *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013); *Almanza*, 686 S.W.2d at 171.

make our own assessment as to whether harm occurred.[56] In order to determine if there has been "some harm," we must look at: (1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) other relevant factors present in the record.[57] The less stringent standard of finding "some harm" still requires us to find that Elizondo "suffered some actual, rather than merely theoretical, harm from the error."[58]

### 1.    The Jury Charge as a Whole

The first *Almanza* factor requires us to consider the entire jury charge.  The first part of the charge defines the offense of murder and its terms.  The latter part of the charge contains boilerplate instructions.  These portions are correctly drafted and do not weigh either in favor of, or against, a finding of some harm.

Paragraph IV, comprising three and a half of the six-and-a-half-page charge, instructs the jury on self-defense.  Paragraph IV begins by tracking the language of Texas Penal Code section 9.32.  However, as the appellate court correctly noted, the instruction fails to include portions of the presumption language that could have benefitted Elizondo:

> The jury charge only provided that a presumption of reasonableness would arise if Elizondo "knew or had reason to believe that the person against [whom] deadly force was used was committing or attempting to commit murder." [Texas Penal Code] § 9.32(b)(1)(C). Elizondo argues that two additional scenarios should have been added to the charge. First, where the

---

[56] *See Trevino v. State*, 100 S.W.3d 232, 241 (Tex. Crim. App. 2003) (citing to *Ovalle v. State*, 13 S.W.3d 774, 787 (Tex. Crim. App. 2000)).

[57] *Almanza*, 686 S.W.2d at 171.

[58] *Reeves*, 420 S.W.3d at 816 (citing to *Warner v. State*, 245 S.W.3d 458, 462 (Tex. Crim. App. 2008)).

actor knew or had reason to believe an assailant "unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, vehicle, or place of business or employment." *Id.* § 9.32(b)(1)(A). And second, where the actor "(B) unlawfully and with force removed, or was attempting to remove unlawfully and with force, the actor from the actor's habitation, vehicle, or place of business or employment." *Id.* § 9.32(b)(1)(B).

Elizondo complains that he knew or had reason to believe that Junior unlawfully and with force pulled him out of his pickup truck, or was attempting to do so. He stated that Junior's banging on Elizondo's driver's side window yelling "Get off asshole" meant that he was entitled to those instructions.

We agree that the evidence in the record warranted the inclusion of these instructions. Accordingly, we hold that the trial court erred by omitting them. Having found error, though, we do not find any egregious harm. . . . Because we previously concluded that a reasonable jury could have found that Elizondo was not entitled to a self-defense argument *because he provoked the initial difficulty and did not abandon the encounter, . . .* these extra instructions would not have affected the outcome.[59]

Contrary to the conclusion reached by the appellate court, we have concluded that the self-defense charge should not have included an instruction on provoking the difficulty. Consequently, it can no longer be said with such certainty that "these extra instructions would not have affected the outcome."[60] Without the provocation limitation on self-defense, the omitted portion of the statutory presumption language in the self-defense instruction might have affected the jury's assessment of self-defense under the egregious-harm standard of *Ngo v. State*.[61] Since the appellate court conducted its harm analysis as if there had been

---

[59] *Elizondo*, 2014 WL 222834 at *8 (emphasis added).

[60] *Id.*

[61] 175 S.W.3d 738, 743-44 (Tex. Crim. App. 2005).

sufficient evidence of provocation, which there was not, the court's harm analysis was flawed. Thus, such error in this portion of the jury charge weighs in favor of finding some harm.

Moreover, the provocation instruction that *was* given to the jury changed the State's burden of proof by instructing the jury to find Elizondo guilty of murder if he provoked the difficulty. The provoking-the-difficulty instruction included in the jury charge was worded as follows:

> You are further instructed as part of the law of this case, and as a qualification of the law on self-defense, that the use of force by a defendant against another is not justified if the defendant provoked the other's use or attempted use of unlawful deadly force, unless (a) the defendant abandons the encounter, or clearly communicates to the other his intent to do so, reasonably believing he cannot safely abandon the encounter, and (b) the other person, nevertheless, continues or attempts to use unlawful force against the defendant.

> So, in this case, if you find and believe from the evidence beyond a reasonable doubt that the defendant, Jose Guadalupe Rodriguez Elizondo, immediately before the difficulty, then and there did some act, or used some language, or did both, as the case may be, with the intent on his, the defendant's, part to produce the occasion for killing the deceased, Fermin Limon, [Sr.], and to bring on the difficulty with the said deceased, and that such words and conduct on defendant's part, if there were such, were reasonably calculated to, and did, provoke the difficulty, and that on such account the deceased attacked defendant with deadly force, or reasonably appeared to defendant to so attack him or to be attempting to attack him, and that the defendant then killed the said Fermin Limon [Sr.], by use of deadly force, to wit, by shooting him with a firearm, in pursuance of his original design, *if you find there was such design, then you will find the defendant guilty of murder.*

> On the other hand, if you find from the evidence that the acts done or language used by the defendant, if any, were not, under the circumstances, reasonably calculated or intended to provoke a difficulty or an attack by deceased upon the defendant, or if you have a reasonable doubt thereof, then, in such event, defendant's right of self defense would in no way be abridged, impaired, or

lessened, and, if you so find, or if you have a reasonable doubt thereof, you will decide the issue of self-defense in accordance with the law on that subject given in other portions of this charge, wholly disregarding and without reference to the law on the subject of provoking the difficulty.

(Emphasis added).

The appellate court limited its finding of error to only a small portion of this instruction—the part of the sentence (emphasized above) that said, if you find provocation, "then you will find the defendant guilty of murder." The appellate court agreed with Elizondo that the jury should have instead been instructed that, if they find provocation, then they should reject self-defense. However, the appellate court found that this error was harmless. In doing so, the appellate court focused only on that one erroneously worded sentence's effect on the State's burden to prove the elements of murder. The appellate court held that its "thorough review of the trial record and jury charge" revealed no harm—"From voir dire to closing arguments, the jury was repeatedly instructed that it was the State's burden to prove that Elizondo committed murder. The jury charge reinforced this tenet."[62]

While it is true that this one sentence of the provocation instruction is indeed erroneously worded, the problems with this provocation instruction, *aside from the fact that it should not have been given in the first place*, run much deeper than that one sentence. In *Reeves v. State*, this Court, in a unanimous opinion, denounced a similarly worded

---

[62] *Elizondo,* 2014 WL 222834 at *9.

provocation instruction in its entirety, finding it to be "[in]comprehensible."[63] Specifically, this Court concluded that this instruction does not make it clear that it is the State's burden to prove provocation beyond a reasonable doubt.[64] Moreover, "[t]he provocation instruction's presence in the jury charge implied that there was some evidence to support every element of the provocation doctrine when there was not."[65]

As a general rule, "in the absence of evidence to the contrary, we will assume that the jury followed [the court's] written instructions."[66] However, as we stated in *Reeves*, "this presupposes that the instructions are understandable."[67] In this case, as in *Reeves*, "[b]ecause

---

[63] *Reeves v. State*, 420 S.W.3d 812, 818 (Tex. Crim. App. 2013) ("That first application paragraph contains 156 words in one sentence. The second paragraph contains 125 words in one sentence. Neither is comprehensible.").

[64] In our opinion in *Reeves*, we refer to pages 216-219 of Volume Two of the Texas Criminal Pattern Jury Charges concerning instructions on provocation, noting:

> The model instructions subdivide the various issues into short lists that jurors may read and understand without undue difficulty. Perhaps most important, the pattern jury charge ensures that the jury understands that it is the State's burden to prove provocation beyond a reasonable doubt. . . . The instruction used in this case does not make that burden clear.

*Id.* at 818 n. 30 (citing to *Smith*, 965 S.W.2d at 514).

[65] *Reeves*, 420 S.W.3d at 819. *See Tave v. State*, 620 S.W.2d 604, 605-06 (Tex. Crim. App. 1981) (concluding that there was no evidence to support the "completely unwarranted" provocation); *McCandless v. State*, 57 S.W. 672, 675 (Tex. Crim. App. 1900) (holding that giving of provocation charge without sufficient evidence was harmful error because it was "calculated to make the jury believe that, in the opinion of the judge, there was evidence tending to show that appellant brought on the difficulty for the purpose of slaying his adversary.")

[66] *Reeves*, 420 S.W.3d at 819 (citing to *Miles v. State*, 204 S.W.3d 822, 827-28 (Tex. Crim. App. 2006)).

[67] *Id.* at 818.

these instructions were not [understandable], 'this is not a case in which the reviewing court should apply the usual presumption that the jury understood and applied the court's charge in the way it was written.'"[68]  While "it is the function of the charge to lead and to prevent confusion,"[69] the provocation charge that was given here was incorrectly worded, misleading, and confusing.  In *Reeves*, this Court went so far as to call a similarly worded charge an "impenetrable forest of legal 'argle-bargle.'"[70]

Also, as in *Reeves*, we note that the physical location of the provocation charge likely magnified its harm.  The instruction on provoking the difficulty "immediately followed the self-defense instruction, 'which makes it more likely that the jury's attention was drawn to the State's provocation theory for avoiding appellant's claim of self-defense.'"[71]  Further, it was the last substantive instruction: "first came murder, then came self-defense, then came provocation-as-a-limitation. . . . So the last substantive instruction that the jury read was the erroneous one."[72]  Therefore, consideration of the first *Almanza* factor weighs in favor of a finding of some harm.

---

[68] *Id.* at 818-819 (quoting *Gelinas v. State*, 398 S.W.3d 703, 711 (Tex. Crim. App. 2013) (Cochran, J., concurring)).

[69] *Id.* at 818 (citing to *Williams v. State*, 547 S.W.2d 18, 20 (Tex. Crim. App. 1977)).

[70] *Id.*

[71] *Id.* at 819 (citing to *Mendoza v. State*, 349 S.W.3d 273, 283 (Tex. App.–Dallas 2011, pet. ref'd).

[72] *Id.*

## 2.     The Arguments of Counsel

The State argued in closing (1) that Elizondo "escalat[ed] the situation by using abusive language towards another person;" (2) that Elizondo was the "first person to pull out a weapon;" (3) that when Elizondo got to his truck the "first thing he does is pull a weapon;" and (4) that "[f]rom the moment that [Elizondo] left – ran from that club, he knew where that gun was, and that's the reason why he was running there, to grab that weapon, to show them his authority, to show them who he really is, and he killed."  Although the prosecutor who first argued for the State did not expressly tie these actions to the provoking-the-difficulty language in the jury charge, the concept that Elizondo started and escalated the fight was key to the State's theory of prosecution.

On the other hand, when the second prosecutor delivered her closing argument, she focused on the evidence tending to show that Elizondo was not in fear of his life.  She did not argue that he provoked the fight or that he had the intent to kill Limon, Sr. under the pretext of self defense:

> And this is why you can infer from the evidence that this trajectory is what happened.  A little scuffle happens here, he takes off, Bryan and Rigo; two short, skinny guys take chase after him.  He's able to clearly – he's tall, fit, athletic, came from a training of being a U.S. Customs – makes it to his truck.  What does [*sic*] Bryan and Rigo have in common?  They're both street smart.  They said, "Oh, God.  He got into his truck.  He must be armed."  They're not going to get close to a vehicle where there's a weapon.  That gave ample opportunity for the wife to clearly get on the passenger side, but the reason she couldn't go in is because it was locked.  When does he decide to come out of that door?  When his brother comes and gets Junior on a chokehold, that's when he decides to come out.

Unlike the prosecutor in *Reeves*, the jurors were not referred directly to the provocation

instruction and told to "pay close attention to it."[73]  Thus, we cannot say that the improper instruction was brought "to the front of the jurors' minds."[74]  We conclude, therefore, that the argument of counsel weighs neither in favor of, nor against, the finding some harm resulting from the provocation instruction.

### 3.  The Entirety of the Evidence

The issue of self-defense was hotly contested.  Elizondo's entire defense rested on the theory of self-defense.  Other witnesses testified to another set of facts that, if believed, supported Elizondo's conviction for murder.  As an appellate court, we will not weigh in on this fact-specific determination, as that is a function reserved for a properly instructed jury.[75]  However, as we have said herein, the jury was not properly instructed.  Therefore, although there was evidence that was inconsistent with Elizondo's theory of self-defense, we cannot conclude that the evidence of guilt was so overwhelming that the erroneous instruction on provoking the difficulty was harmless.  The entirety of the evidence weighs in favor of a finding of some harm.

### 4.  Other Relevant Evidence Contained in the Record

It is relevant to the harm analysis that the provocation instruction undermined Elizondo's sole defense.  As the fact-finder, the jury was free to reject some or all of

---

[73] *Id* at 820.

[74] *Id.*

[75] *See Reeves,*  420 S.W.3d at 819 (citing to *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010).

Elizondo's version of the events, and having done so, the jury could rationally have found all of the essential elements of murder beyond a reasonable doubt. Nevertheless, we cannot determine if the jury actually rejected Elizondo's self-defense claim because they disbelieved his testimony, or if the jury was prevented from reaching his self-defense claim due to the erroneous submission of the provocation instruction. "Although an erroneous provocation instruction will not necessarily be harmful when self-defense is the sole defensive theory, that factor goes on the 'some harm' side of the scale rather than the 'no harm' side."[76]

After considering all four of the *Almanza* factors, we hold that Elizondo suffered some harm when the jury was erroneously instructed on provoking the difficulty absent the proper evidentiary support under *Smith v. State*.

**CONCLUSION**

For the reasons discussed herein, we hold that the Thirteenth Court of Appeals erred by affirming Elizondo's conviction. The instruction regarding provoking the difficulty was erroneously worded, and it should not have been included in the court's charge to the jury in the first place. We hold that the inclusion of the provocation instruction in the jury charge caused some harm. We need not address Elizondo's remaining grounds for review. The judgment of the Thirteenth Court of Appeals is reversed, and the case is remanded to the trial court for a new trial.

DELIVERED:       April 6, 2016
PUBLISH

---

[76] *Reeves*, 420 S.W.3d at 821.