**Opinion filed September 11, 2020**



In The

# Eleventh Court of Appeals

_____

## No. 11-18-00225-CR

_____

### TANNER ONEAL ENGEL, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 32nd District Court**
**Nolan County, Texas**
**Trial Court Cause No. 12196**

## O P I N I O N

The jury convicted Tanner Oneal Engel of the offense of murder, a first-degree felony. TEX. PENAL CODE ANN. § 19.02(c) (West 2019). The jury assessed Appellant's punishment at confinement for a term of twenty years in the Institutional Division of the Texas Department of Criminal Justice. The trial court sentenced Appellant accordingly.

Appellant presents two issues on appeal. In his first issue, Appellant complains of jury-charge error. In his second issue, Appellant complains of the amount of the attorney's fees that were assessed against him. We modify the amount of attorney's fees in the trial court's judgment and bill of costs, and we affirm as modified.

*Background Facts*

Appellant does not dispute that the evidence shows that he committed the felony offense of possessing a prohibited weapon—a modified firearm—and that he intentionally and knowingly pointed or attempted to point the modified weapon at Brandon Heath Abeita, an act clearly dangerous to human life, that caused Abeita's death. He instead asserts that the trial court erroneously charged the jury during the guilt/innocence phase of trial. Because we must consider whether the evidence supported the inclusion of a provoking-the-difficulty instruction[1] in the trial court's charge, we set out that portion of the evidence at length.

On April 3, 2016, Michael Hillis saw a man, whom he had never seen before, walking up and down the street near Hillis's home; the man appeared to be in search of someone or something. Hillis later observed a pickup, traveling at a "faster than normal speed," drive to the house at 1103 Fowler Street, which was "catty-corner" and a few houses down from Hillis's home. The man who had been walking (Abeita) met with the driver of the pickup (Appellant) at the curb. Hillis was not sure whether the man "was right there on the curb when the pickup drove up or if he was in the house and came out," but Hillis was sure that the men spoke and "had a few words"

---

[1] As explained by the Court of Criminal Appeals in *Smith v. State*:

> Provoking the difficulty, as the doctrine of provocation is commonly referred to in our jurisprudence, is a concept in criminal law which acts as a limitation or total bar on a defendant's right to self-defense. The phrase "provoking the difficulty" is a legal term of art, and more accurately translates in modern usage to "provoked the attack."

965 S.W.2d 509, 512 (Tex. Crim. App. 1998).

while at the curb.  Hillis heard loud talking but was uncertain whether the men were angry with each other, and he did not see any pointing of fingers, pushing, or guns.  The men walked to the house, and Hillis continued to hear loud talking.  A few minutes later, Hillis saw Appellant casually walk back to the pickup, reach in, and pull out something that could have been a long tool, like a wrench.  At trial, Hillis was shown a picture of Appellant's shotgun and confirmed that Appellant's shotgun was about the same length and color of the item he saw Appellant carrying.  Appellant carried the item to the side, next to his leg, and returned to the porch of the house, which was obscured from Hillis's view.  Hillis again heard the men talking and then heard a "gun blast."  Hillis went inside his house and told his wife to call the police.

Soon after 11:00 a.m. that day, Sergeant Armando Barnes Renteria of the Sweetwater Police Department responded to a report of a major crash near the intersection of Fowler and 12th Street, where he found Abeita lying across the front seat of a pickup that had crashed into a utility pole.  Sergeant Renteria observed blood on the exterior and interior of the pickup.  Abeita had a large wound to the front of his neck.

Detective Ray Cornutt arrived at the scene in response to reports of a vehicle accident and a shooting.  He spoke with Appellant, who informed him that he was the shooter.  During the pat-down for officer safety, Detective Cornutt found two .410 shotgun shells in Appellant's left front pocket.

Sergeant Todd Jones also responded to the scene and spoke with Appellant.  Sergeant Jones, who oversees the Criminal Investigations Division of the Sweetwater Police Department and is the head firearms instructor, testified that he had never seen anything like Appellant's firearm.  It was a Mossberg Bolt Action .410 shotgun that had been modified and sawed off and did not bear a National Firearms Act serial number as required.  Appellant's shotgun was found inside the

3

residence "oriented with the muzzle towards the doorway." Lying outside on the front porch was a .380 pistol inside a toboggan. The .380 pistol had a round in the chamber and three rounds in the magazine. The toboggan was surrounded by bloodspots, but none were found on the pistol.

Appellant told Sergeant Jones that Abeita had pulled the pistol from the toboggan and that Appellant had made a motion to suggest that they both put their guns down. According to Sergeant Jones, Appellant explained that, as Appellant bent down to lay his shotgun on the floor, Abeita made a sudden movement and Appellant "may have flinched and the gun went off." Appellant repeatedly declared that he had not wanted to kill Abeita. Appellant told Sergeant Jones that he did not bring the shotgun to the house but that it was in the house. However, Appellant also stated that, if he "was going to kill that guy, he would have loaded five shots before he even got there." Sergeant Jones confirmed as part of his investigation that Abeita had been in possession of two pistols.

Sergeant Jones agreed that Appellant's statement—that, as he was setting the shotgun down, Abeita made a sudden movement and that is why he shot Abeita in the throat instead of the legs—"could be absolutely 100 percent true." But the trajectory would have been upward. The autopsy on Abeita revealed a gunshot wound to Abeita's neck from front to back and from right to left at a "straight angle." No upward or downward deviations were present.

The record reflects that Appellant and the owner of the home at 1103 Fowler Street, Jeremy Guerra, were close, longtime friends. Appellant was living with him in April 2016. Appellant did not stay at Guerra's house on the evening of April 2, 2016, but arrived the next morning at about 8:00 or 8:30 a.m. That morning, Abeita, who had been walking up and down the street and "acting all crazy," walked up to Guerra's house. Guerra invited Abeita into his home and told him to calm down. Abeita showed Guerra a gun that Abeita was carrying inside a toboggan. Guerra felt

threatened because Abeita was taking the bullets out, "undoing" the clip, "messing with" the gun, and carelessly pointing it. Approximately thirty or forty-five minutes later, Abeita and Appellant both left Guerra's house. Abeita returned ten or twenty minutes later and informed Guerra that he needed to charge a device. Guerra allowed Abeita to do this and told him to sit on a stool, but Abeita began searching in a cooler where Appellant had stored a video camera and some other items. Guerra told Abeita that those were not Abeita's belongings, that he did not need to sift through them, and that he needed to take his charger and leave. Abeita was upset that Guerra had told him to leave. Before Abeita left, Guerra called Appellant to let him know that Abeita had returned and had taken Appellant's video camera.

Appellant returned to the house and asked Guerra what had happened, and Guerra told Appellant that Abeita had searched Appellant's belongings and had taken Appellant's video camera. Abeita then walked back to Guerra's house. Guerra said that, while Appellant was standing inside the house and Abeita was standing on the porch, they had a loud discussion about the return of Appellant's video camera. Guerra heard Appellant tell Abeita to leave, stating that he did not care about the video camera and would just get another one. Guerra did not think that Abeita was threatening to shoot Appellant, and Guerra did not see Appellant walk to the pickup to get a weapon or retrieve a weapon from the house. Guerra was not paying much attention to Appellant and Abeita. Guerra did not see Appellant's shotgun until after the shooting. Guerra testified that he did not keep guns at his home, was not aware of anyone else storing guns at his residence, and did not believe that there were any guns present at his home on April 3, 2016.

Lori Kidd testified as a defense witness. Kidd stated that Abeita was troubled and had been acting like someone who had experienced a nervous breakdown. Abeita was using methamphetamine, carrying around guns, pulling them out, and

acting in a way that was dangerous to himself and others. We note that Abeita's autopsy revealed amphetamine, methamphetamine, and marihuana in his system.

Appellant testified that on April 1, 2016, he and Abeita fought. Appellant explained that he was at Tina Allen's house when Abeita called him about some money that Appellant owed Abeita and his brother for a car that Appellant had purchased. Abeita then attempted to assault Appellant's nephew, Nick. Appellant spoke with Abeita again and told him, "If I have to waste my gas to come over there, I'm going to whoop your butt." Because Nick weighed only about ninety pounds, Appellant drove to the curb between Guerra's house and a house on Fowler Street where Nick's friend lived, and he saw Abeita pushing Nick. Abeita approached Appellant, and they began fighting. Appellant threw Abeita down and punched him twice, and then Abeita got up and drew a "western" gun. Appellant ran away.

Appellant did not see Abeita again until April 3, 2016, after Guerra called him at about 8:30 a.m. and said that Abeita was walking around Guerra's house. After determining that Guerra was "all right," Appellant drove to Guerra's house. Appellant had his .410 shotgun in the pickup but had no shells for it. Appellant had never seen Abeita at Guerra's house before, but when Appellant arrived, Abeita was standing in the doorway looking out. Abeita "just looked kind of crazy"; Abeita pulled a gun out of a toboggan but did not aim it at Appellant. Because of their fight two days earlier, Appellant asked if the gun was real, and Abeita cocked the gun. Appellant observed a bullet fly out of the gun and knew that the gun was loaded. Appellant had no protection and proceeded to speak with Abeita so that nothing "got out of hand."

Abeita did not aim the gun at Appellant but waved it to let Appellant know that he had a pistol. About 10:00 or 10:30 a.m., Appellant left to go to Tina's house to work on his car; he dropped Abeita off at a nearby house. Not long thereafter, Guerra called and informed Appellant that Abeita was at Guerra's house again.

6

Appellant heard Guerra telling Abeita to "put the s--t down" because it was not his. Appellant asked Guerra, "What is he trying to take?" Guerra replied, "He's off in your cooler," and Appellant heard Guerra tell Abeita to put the video camera down. Appellant told Guerra to not let Abeita take the video camera or other items. At that time, the phone "went blank." Appellant was unsure whether the phone had "died" or something else had happened, but no one was on the phone. Because Abeita had pulled a gun earlier in the day, Appellant felt that he needed to take some ammunition with him, and he grabbed a handful of shells from his car, placed them in his pocket, and drove to Guerra's house.

Appellant testified that, when he arrived, he saw Abeita walking in the road. After Appellant drove up to the house, Abeita walked back toward the house. Appellant opened his pickup door; yelled, "Brandon, if you stole any of my stuff, I'm going to kick you're a-s again"; and then grabbed his shotgun and walked inside the house to look through his things. He put a shell inside the .410 shotgun and set it down. Appellant looked up and saw Abeita standing in the doorway. Appellant cocked his shotgun and, as he put the gun down on the ground, told Abeita that he was not the only one with a gun. Appellant testified that his frame of mind was to scare Abeita rather than shoot him. Abeita still had his gun in the toboggan, and Appellant was thinking, "Just get the hell out of here." When Appellant demanded that Abeita leave, Abeita aimed the gun in the toboggan directly at Appellant. Appellant testified that he took three steps back, reached down, grabbed his shotgun, shot Abeita in the neck, and dropped his shotgun. Appellant could not believe it and was in shock. Appellant panicked, went outside, and saw that he had shot Abeita in the neck. He grabbed Abeita by the back of his belt loop, walked him down the steps, and placed him in the pickup to get him to the hospital, but Abeita grabbed the gearshift, "took off," and then hit a telephone pole. Appellant called 9-1-1.

7

On cross-examination, Appellant admitted that his shotgun was a modified firearm but stated that he did not know that the barrel had been sawed off. Appellant indicated that he had taken his shotgun to protect himself and Guerra. Appellant testified that he had cocked the shotgun to let Abeita know that it was loaded, set it down in front of the television, and hoped that Abeita would set his gun down. Appellant testified that he had intentionally shot Abeita because he was fearful that Abeita was about to shoot him, but Appellant declared that he did not want to shoot Abeita and that he did not intend to kill anybody.

*Analysis*

*Issue One: Jury Charge*

In his first issue on appeal, Appellant presents four arguments in which he complains that the trial court's charge during the guilt/innocence phase of trial was erroneous. In his first sub-issue, Appellant asserts that the trial court erred when it included a provocation instruction in the charge. In his second sub-issue, Appellant complains that the trial court's charge improperly stated the provocation instruction. In his third sub-issue, Appellant complains that the trial court's self-defense charge was incomplete because the trial court failed to include an instruction regarding threat of deadly force by production of a weapon. In his fourth sub-issue, Appellant asserts that the trial court's incorrect reading of the felony murder instruction to the jury constituted a comment on the weight of the evidence.

The trial court must deliver a written charge to the jury and, within it, must distinctly set forth the law applicable to the case. TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007). We review a complaint of jury-charge error under a two-step process, and we first consider whether error exists. *See Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If error does exist, we then analyze that error for harm under the procedural framework of *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1985). "The standard of review for jury charge error depends on

whether the error was preserved." *Jordan v. State*, 593 S.W.3d 340, 346 (Tex. Crim. App. 2020) (citing *Almanza*, 686 S.W.2d at 171); *Mendez v. State*, 545 S.W.3d 548, 552 (Tex. Crim. App. 2018). Unpreserved charge error is reversible only if it caused egregious harm. *Jordan*, 593 S.W.3d at 346. Preserved charge error is reversible if it caused "some harm." *Id.* at 346.

The record indicates that Appellant did not object to the inclusion of an instruction on provocation, to the wording of the provocation instruction given, or to the omission of an instruction on threat of deadly force by production of a weapon. Consequently, if charge error exists, we must determine whether it caused egregious harm. *Jordan*, 593 S.W.3d at 346.

A. *Inclusion of an Instruction on Provoking the Difficulty*

As a matter of self-defense, a person is not justified in using force against another if the actor provoked the person against whom the force was used. *See* PENAL §§ 9.31(b)(4), 9.32(a)(1) (West 2019); *Smith v. State*, 965 S.W.2d 509, 512 (Tex. Crim. App. 1998) ("The rule of law is that if the defendant provoked another to make an attack on him, so that the defendant would have a pretext for killing the other under the guise of self-defense, the defendant forfeits his right of self-defense."). The trial court must give a charge on provocation when sufficient evidence supports a finding of three elements: (1) the defendant did some act or used some words which provoked the attack on the defendant; (2) such act or words were reasonably calculated to provoke the attack; and (3) the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting harm upon the other. *Smith*, 965 S.W.2d at 513. However, "[a]n instruction on provocation should *only* be given when there is evidence from which a rational jury could find *every element* of provocation beyond a reasonable doubt." *Elizondo v. State*, 487 S.W.3d 185, 197 (Tex. Crim. App. 2016) (quoting *Smith*, 965 S.W.2d at 514). The inclusion of the provoking-the-difficulty charge when it is

unsupported by the facts constitutes an unwarranted limitation on the right of self-defense and is trial error. *Id.* We must view the evidence "in the light most favorable to giving the instruction" and determine whether there was sufficient evidence from which a rational jury could have found each element of provocation beyond a reasonable doubt. *Smith*, 965 S.W.2d at 514.

Appellant acknowledges that the evidence satisfies the first two *Smith* elements. We agree. There is some evidence from which the jury could rationally find beyond a reasonable doubt that Appellant's acts or words, whether taken alone or considered in conjunction with the relations of the parties and other circumstances surrounding the difficulty, actually caused the attack on him and were reasonably capable of causing the attack or had a reasonable tendency to cause the attack on him. *See Elizondo*, 487 S.W.3d at 199. Appellant concedes that his "kick your ass" threat to Abeita and the loading and pointing of his shotgun at Abeita's legs were words and acts that were reasonably capable of causing Abeita to attack him.

Appellant does not concede the third *Smith* element. To satisfy the third *Smith* element, "there must be some evidence from which a rational jury *could* find beyond a reasonable doubt that the act was done, or the words were used, for the purpose and with the intent that the defendant would have a pretext for killing the victim." *Elizondo*, 487 S.W.3d at 200 (emphasis added). A person's act, even if it provokes an attack, will not subject the person to loss of the right to assert self-defense if the person did not intend that the act would have such an effect as part of a scheme to harm the victim. *Id.* Under this third element, the trial court's inclusion of the provoking-the-difficulty instruction in its charge is only supported if evidence was raised from which a rational jury could reasonably find that Appellant possessed an intent to provoke so that he would have a pretext to harm Abeita under a guise of self-defense. *See id.* at 201. Cases in which a provocation instruction has been deemed improper because there was insufficient evidence to support a finding on the

10

third element of provocation are a "rarity," and they typically involve strangers or circumstances in which it is not conceivable that the defendant had orchestrated events for the purpose of gaining a pretext to harm the complainant. *See Smith*, 965 S.W.2d at 518–19.

Intent is a question of fact that is to be determined from all the circumstances, including a defendant's words, acts, and conduct occurring before, during, or after the provocation. *Id.* In this case, to support the giving of the charge on provoking the difficulty, the record must contain evidence from which a rational jury could find beyond a reasonable doubt that Appellant intended his acts to have a provocative effect as part of a larger scheme of doing harm to Abeita. *Elizondo*, 487 S.W.3d at 202. Acts of provocation alone can carry an inference of intent, and the actor's actions during or after the provocation can illuminate the actor's intent. *Id.* A jury can rely on wholly circumstantial evidence to find provoking acts or words, but the evidence must create more than mere suspicion because a jury is not permitted to reach speculative conclusions. *Id.* at 203.

Appellant argues that the evidence was not sufficient to support giving the provoking-the-difficulty charge and that the giving of the instruction was an impermissible limitation on his right of self-defense. We disagree with Appellant's assessment of the evidence. Viewed in the light most favorable to giving the instruction, we conclude that there was sufficient evidence from which a rational jury could have found the third provocation element beyond a reasonable doubt.

Appellant and Abeita were not strangers. They had been in a fight two days prior to the shooting. At that time, Appellant threw Abeita on the ground and struck him twice, and only then did Abeita pull his gun on Appellant. Additionally, the first time that Appellant drove to Guerra's house on the morning of the shooting, Appellant had an unloaded shotgun and Abeita had a loaded pistol. Later that morning, after he learned that Abeita had taken a video camera from Guerra's house,

11

Appellant grabbed a handful of shells and his shotgun and once more drove to Guerra's house. Appellant yelled to Abeita that he would "kick [Abeita's] ass again" if Abeita had stolen any of Appellant's belongings. Appellant alone testified that Abeita had threatened to kill him if he ever accused Abeita of stealing his things again. Additionally, by Appellant's own account, he took his shotgun and ammunition into the house and was loading his shotgun when Abeita returned. He cocked his shotgun to ensure that Abeita knew that Appellant possessed a loaded shotgun, told Abeita that he was not the only person with a gun, and then lunged at Abeita as he told Abeita to leave.

From this evidence, a rational jury could infer from the context of the relationship between Appellant and Abeita, combined with their recent physical altercation and Appellant's statements referencing future physical harm to Abeita, that Appellant was aware that Abeita would react in a way that would require Appellant to use the weapon that he brought to the confrontation. The jury could have found beyond a reasonable doubt that Appellant's words and acts of telling Abeita that he was going to "kick [his] ass," visibly showing Abeita that he was loading a weapon, and lunging toward Abeita were intended and calculated to provoke Abeita's response—drawing his toboggan-shrouded gun—as a pretext for killing him. The trial court properly decided that the evidence supported a provoking-the-difficulty instruction. *See id.* at 202.

B. *Wording of the Instruction on Provoking the Difficulty*

In his second sub-issue, Appellant complains that the provoking-the-difficulty instruction that the trial court included in the jury charge was improperly worded and changed the State's burden of proof. The trial court first instructed the jury on self-defense followed by this instruction on provocation:

> You are further instructed as part of the law of this case, and as a qualification of the law on self-defense, that the use of force by a

defendant against another is not justified if the defendant provoked the other's use or attempted use of unlawful force, unless (a) the defendant abandons the encounter, or clearly communicates to the other his intent to do so, reasonably believing he cannot safely abandon the encounter, and (b) the other person, nevertheless, continues or attempts to use unlawful force against the defendant.

So, in this case, if you find and believe from the evidence beyond a reasonable doubt that the defendant, TANNER ONEAL ENGEL, immediately before the difficulty, then and there did some act, or used some language, or did both, as the case may be, with the intent on his, the defendant's, part to produce the occasion for killing the deceased, Brandon Heath Abeita, and to bring on the difficulty with the said deceased, and that such words and conduct on the defendant's part, if there were such, were reasonably calculated to, and did, provoke a difficulty, and that on such account the deceased attacked defendant with deadly force, or reasonably appeared to defendant to so attack him or to be attempting to so attack him, and the defendant then killed the said Brandon Heath Abeita by the use of deadly force, to-wit: by shooting him with a gun, in pursuance of his original design, *if you find there was such design, then you will find the defendant guilty of murder* and reject the defendant's claim of self-defense.

On the other hand, if you find from the evidence that the acts done or language used by the defendant, if any, were not, under the circumstances, reasonably calculated or intended to provoke a difficulty or an attack by deceased upon the defendant, or if you have a reasonable doubt thereof, then, in such event, defendant's right of self-defense would not be abridged, impaired, or lessened, and, if you so find, or if you have a reasonable doubt thereof, you will decide the issue of self-defense in accordance with the law on that subject given in other portions of this charge, wholly disregarding and without reference to the law on the subject of provoking the difficulty.

(Emphasis added).

Appellant argues that it was improper for the trial court to instruct the jury that it must "find Appellant guilty of *murder*" if it determined that Appellant had provoked the difficulty, rather than simply rejecting Appellant's claim of self-

13

defense. Appellant also complains that the "179-word instruction" did not clearly explain the State's burden of proof and likely caused confusion and misled the jury.

In support of his contentions, Appellant relies on the analysis in *Elizondo*, which addressed the same language within a provoking-the-difficulty instruction. *Id.* at 206. Like this case, the application paragraph of the provoking-the-difficulty instruction in *Elizondo* directed the jury, "[*I*]*f you find there was such design*, *then you will find the defendant guilty of murder*." *Id.* at 206–07. Unlike this case, Elizondo had preserved his complaint, and the instruction was not supported by the evidence. *Id.* at 200, 203.

In performing its "some harm" analysis, the Court of Criminal Appeals declared that the italicized language had changed the State's burden of proof by instructing the jury to find Elizondo guilty of murder if Elizondo had provoked the difficulty. *Id.* at 206. In its review of the lower court's holding, the Court of Criminal Appeals observed: "While it is true that this one sentence of the provocation instruction is indeed erroneously worded, the problems with this provocation instruction, *aside from the fact that it should not have been given in the first place*, run much deeper than that one sentence." *Id.* at 207. Relying on its opinion in *Reeves*, the court concluded that the provocation instruction was not only incorrectly worded but was also misleading and confusing and that the *Almanza* harm factors weighed in favor of finding "some harm." *Id.* at 208–09; *see Reeves v. State*, 420 S.W.3d 812, 816–19, 821 (Tex. Crim. App. 2013) (criticizing strongly the complexity, sentence length, and lack of coherence of the provoking-the-difficulty instruction similar to that given here).

We agree that the trial court's directive to the jury—that it must find Appellant guilty of murder if he provoked the difficulty—was erroneous because it changed the State's burden of proof and failed to make it clear to the jury that the State bore the burden to prove provocation beyond a reasonable doubt. *See Elizondo*, 487

14

S.W.3d at 206; *Reeves*, 420 S.W.3d at 819 n.30 (citing *Smith*, 965 S.W.2d at 514). Having found error, we must determine whether the error constitutes reversible error.

Because Appellant did not object to the provoking-the-difficulty instruction in the trial court, we apply the *Almanza* factors and will reverse only if there is a showing of egregious harm such that Appellant was deprived of a fair and impartial trial. *Jordan*, 593 S.W.3d at 346; *Mendez*, 545 S.W.3d at 552; *Almanza*, 686 S.W.2d at 171. Errors that result in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, or vitally affect a defensive theory. *Almanza*, 686 S.W.2d at 172. Direct evidence of harm is not required to establish the existence of egregious harm. *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996). To determine whether the charge error resulted in egregious harm, we consider (1) the jury charge as a whole; (2) the state of the evidence including contested issues and the weight of the probative evidence; (3) arguments of counsel; and (4) any other relevant information revealed by the record of the trial as a whole. *Almanza*, 686 S.W.2d at 171.

The first factor requires our consideration of the entire jury charge. *Almanza*, 686 S.W.2d at 172. The first two sections of the trial court's charge explain the indicted offense and define in the abstract the offense of murder and other relevant terms. The third section explains the law justifying the use of force and deadly force in self-defense and defense of a third person, defines the relevant terms of those defenses, and explains that a person who has neither provoked the person against whom deadly force is used nor engaged in criminal activity at the time such force is used is not required to retreat before using deadly force in defense of himself or a third person. It further explains that deadly force is not justified in response to verbal provocation alone. Bypassing consideration of the fourth section for the moment, the fifth section contains the application paragraph and instructs the jury to consider

whether Appellant's conduct was justified as self-defense and to acquit Appellant if the jury has a reasonable doubt. The sixth section explains the law relating to the presumption of innocence, the State's burden of proving each and every element of the charged offense beyond a reasonable doubt, and an instruction that if a reasonable doubt as to Appellant's guilt exists after considering all of the evidence and the instructions in the charge, the jury will render a "[n]ot guilty" verdict. Section seven explains that the indictment is not evidence of guilt, and section eight contains procedural boilerplate. These correctly drafted sections do not favor a finding of egregious harm.

Section four of the charge, however, embodies the provoking-the-difficulty instruction in the abstract, followed by two application paragraphs. The provoking-the-difficulty instruction in this case is unwieldy in its length, complexity, and coherence. As in *Elizondo* and *Reeves*, this instruction is incorrectly worded, misleading, confusing, and practically incomprehensible. *Elizondo*, 487 S.W.3d at 208; *Reeves*, 420 S.W.3d at 818. Consequently, we do not apply the usual presumption that the jury understood and applied the court's charge in the way it was written. *Reeves*, 420 S.W.3d at 819.

In *Reeves* and *Elizondo*, the erroneous provoking-the-difficulty charge immediately followed the charge on self-defense—making it more likely that the jury's attention was drawn to the provocation theory in rejecting the defendant's claim of self-defense—and was the last substantive instruction in the charge. *Elizondo*, 487 S.W.3d at 208; *Reeves*, 420 S.W.3d at 819. This placement of the erroneous instruction within the charge, the Court of Criminals concluded, likely magnified its harm. *Elizondo*, 487 S.W.3d at 208; *Reeves*, 420 S.W.3d at 819.

In the present case, the erroneous provoking-the-difficulty instruction also immediately follows the self-defense instruction but, significantly, is not the last substantive instruction in the trial court's charge. Rather, it is followed by the

16

application paragraph and then a paragraph in which the trial court instructed the jury: "Unless you so find and believe beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant of murder as alleged in the indictment and say by your verdict 'Not Guilty.'" We conclude that the jury-charge-as-a-whole factor leans toward some harm but, alone, does not rise to egregious harm.

The second *Almanza* harm factor requires that we consider the state of the evidence, including contested issues and the weight of the evidence. *Almanza*, 686 S.W.2d at 171. Although Appellant testified to facts that, if believed, may have supported his self-defense claim, other testimony and evidence, including Appellant's recorded statements to the police, supported his conviction for murder. However, the evidence of guilt was sufficiently overwhelming such that the state of the evidence does not weigh in favor of a finding of egregious harm.

Under the third *Almanza* harm factor, we consider the arguments of counsel. *Almanza*, 686 S.W.2d at 171. The State addressed the "provoking" language set out in the self-defense paragraph. As Appellant has acknowledged, no argument was explicitly presented regarding the provoking-the-difficulty instruction. The State did not direct the jury to that portion of the trial court's charge. The arguments focused on the witnesses' testimony, on whether Abeita was an aggressor, on the fact that Appellant repeatedly traveled to encounter Abeita, and on whether Appellant was justified to act in self-defense or defense of a third person. Defense counsel argued that, before the jury could find Appellant guilty of murder, it must first "disprove" self-defense or defense of a third person. This factor does not lean toward a finding of egregious harm.

In the last part of our harm analysis, we consider other relevant information revealed by the record. *Almanza*, 686 S.W.2d at 171. We have found no other relevant information that would weigh in favor of a finding of egregious harm. After

considering each of the *Almanza* harm factors, we conclude that Appellant did not suffer egregious harm from the erroneously worded provoking-the-difficulty instruction in the trial court's charge.

### C. *Omission of Instruction on Threat as Justifiable Force*

In his third sub-issue, Appellant complains that the trial court improperly omitted an instruction on the threat-of-force justification located in Section 9.04 of the Texas Penal Code. That section provides:

> The *threat of force is justified* when the use of force is justified by this chapter. For purposes of this section, a *threat* to cause death or serious bodily injury by the production of a weapon or otherwise, as long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, does not constitute the use of deadly force.

PENAL § 9.04 (emphasis added). Appellant did not request this instruction or object to its omission.

Appellant relies on *Gamino v. State*, 537 S.W.3d 507 (Tex. Crim. App. 2017), in support of his contention. In *Gamino*, the defendant was charged with aggravated assault for threatening the complainant with a deadly weapon. 537 S.W.3d 508 & n.1. The Court of Criminal Appeals held that Gamino was entitled to an instruction pursuant to Section 9.04 and declared that Section 9.04 is not a separate statutory defense but, rather, subsists within self-defense under Section 9.31, which establishes when a person's use of force is justified. *Gamino*, 537 S.W.3d at 510–11; *see* PENAL §§ 9.04, 9.31. The language of Section 9.04 indicates that it applies to justify the "threat" of force or deadly force, not the actual use of deadly force. *See* PENAL § 9.04; *Pham v. State*, 595 S.W.3d 769, 779 (Tex. App.—Houston [14th Dist.] 2019, pet. filed); *see also Gamino*, 537 S.W.3d at 511. Here, as in *Pham*, Appellant used deadly force and was charged with murder; he was not charged with any offense related to a threat to use force. Consequently, Appellant was not entitled

to a Section 9.04 threat-of-force instruction in conjunction with the instruction on self-defense.  *See Pham*, 595 S.W.3d at 779.

### D. *Reading of the Charge to the Jury*

In his fourth sub-issue, Appellant asserts that the trial judge's misreading of two words from the written charge constituted a comment on the weight of the evidence.  The application paragraph of the jury charge reads as follows:

> Now, if you find from the evidence beyond a reasonable doubt, that on or about the 3rd day of April, 2016, in Nolan County, Texas, the defendant, TANNER ONEAL ENGEL, did then and there intentionally or knowingly commit or attempt to commit an act clearly dangerous to human life, to-wit: pointing a modified firearm at Brandon Heath Abeita, *that caused* the death of Brandon Heath Abeita, hereafter and the defendant was then and there in the course of committing a felony, to-wit: possessing a prohibited weapon, to-wit: a short barrel firearm, and the death of the Brandon Heath Abeita was caused while the defendant was in the course of and in furtherance of or the immediate flight from the commission or attempt of the felony, you will consider whether the defendant's conduct was justified as self-defense.

(Emphasis added.)

When the trial judge read the charge to the jury, in place of the italicized words, he said "and causing."  Appellant did not object to this misstatement of the charge.  The jury was provided with copies of the written charge, which correctly stated the felony-murder application paragraph.

We should use common sense in determining whether there is a reasonable likelihood that the jury was misled.  *See Mireles v. State*, 901 S.W.2d 458, 460 (Tex. Crim. App. 1995).  We conclude that the words spoken by the trial judge in this case did not constitute a comment on the weight of the evidence.  Moreover, the alleged misreading was cured by the submission of the correct written charge to the jury.

Having addressed all four sub-issues and concluded that no reversible error exists, we overrule Appellant's first issue.

19

*Issue Two: Attorney's Fees*

In his second issue, Appellant asserts that the trial court's judgment should be reformed because it improperly assessed attorney's fees against him. The judgment reflects that the trial court imposed attorney's fees of $6,500 against Appellant. The bill of costs contains a line item assessing $6,500 for "Court Attorneys Fees." The State concedes that the trial court erred and agrees that the trial court's judgment should be reformed.

A trial court is permitted to order a defendant to repay the costs of court-appointed legal counsel that the court finds the defendant is able to pay. CRIM. PROC. art. 26.05(g) (West Supp. 2019); *Cates v. State*, 402 S.W.3d 250, 251 (Tex. Crim. App. 2013); *Mayer v. State*, 309 S.W.3d 552, 556 (Tex. Crim. App. 2010). In the context of assessing attorney's fees, a defendant who is determined by the court to be indigent is presumed to remain indigent for the remainder of the proceedings in the case unless a material change in the defendant's financial circumstances occurs. CRIM. PROC. art. 26.04(p); *Mayer*, 309 S.W.3d at 557.

In this case, the trial court had determined that Appellant did not meet the indigency standards of the court but found that the interests of justice required that counsel be appointed to represent Appellant. When it appointed counsel, the trial court ordered Appellant to pay $50 per month toward his court-appointed attorney fees, not to exceed $650. The trial court did not make any additional determinations regarding Appellant's indigency or his ability to pay more than $650 and never found that he was able to repay court-appointed attorney's fees of $6,500. *See Cates*, 402 S.W.3d at 252. Because there is no factual basis in the record to support a determination that Appellant could pay more than $650 for attorney's fees, the proper remedy is to reform the trial court's judgment and the bill of costs by modifying the amount of attorney's fees to reflect the amount of $650, rather than $6,500. We sustain Appellant's second issue.

*This Court's Ruling*

We modify the judgment of the trial court and the bill of costs to reflect that attorney's fees imposed against Appellant shall be in the amount of $650, rather than $6,500; as modified, we affirm.


KEITH STRETCHER

JUSTICE


September 11, 2020

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Stretcher, J., and Wright, S.C.J.[2]

Willson, J., not participating.

---

[2]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.